## DOHANY v. CITY OF BIRMINGHAM.

1. Waters and Watercourses—Municipal Corporations—Riparian Rights.

A city may not claim riparian rights in a natural watercourse where no part of it lies within the city as the city under such circumstances is not a riparian owner.

2. Same—Municipal Corporations—Raw Sewage.

Fact that surface water finds its natural outlet in watercourse traversing plaintiff's land would not afford city, not a riparian owner, the right to use such watercourse for purpose of disposing of raw sewage.

3. Injunction—Abatement of Nuisance—Sewage—Open Watercourse.

Equity has jurisdiction to restrain the pollution of a watercourse by casting sewage therein in quantity sufficient to occasion a nuisance.

4. Waters and Watercourses—Municipal Corporations—Sewage—Due Process.

A city may not injure the rights of riparian owners by polluting a watercourse with sewage as such rights are protected by the Constitution and cannot be taken away except by due process of law (Const. 1908, art. 2, § 16).

Discussion of invasions of interests in the private use of land (private nuisance), 4 Restatement, Torts—Scope and Introductory Notes to chapter 40, particularly portion devoted to distinguishing action for damages for private nuisance from suit for injunction (p. 223).

5. MUNICIPAL CORPORATIONS—SEWAGE DISPOSAL—WEATHER.

The duty of a city to care for its sewage disposal does not end with the end of normal weather and advent of excessive rainfall.

6. NUISANCE—ABATEMENT—POLLUTED WATERCOURSE.

The right of the owner of land traversed by a natural watercourse to have abatement of nuisance created by nearby city in dumping sewage therein does not depend upon the use of the water therein for drinking or domestic purposes where the value of his land is materially lessened by such nuisance.

7. SAME—PERIODIC POLLUTION OF WATERCOURSE—ABATEMENT.

City from which sewage is discharged across natural watercourse over plaintiff's land during excessively rainy weather only is allowed a reasonable time to make necessary improvements to handle all of its sewage and thereafter permanently enjoined from discharging raw sewage into such watercourse.

CHANDLER, C. J., dissenting.

Appeal from Oakland; Hartrick (George B.), J. Submitted October 9, 1941. (Docket No. 29, Calendar No. 41,522.) Decided March 17, 1942. Rehearing denied May 18, 1942.

Bill by Charles E. Dohany against City of Birmingham and others to restrain pollution of a watercourse and for other relief. Bill dismissed as to injunctive relief. Plaintiff appeals. Reversed.

*George A. Porter (Pelton & McGee,* of counsel), for plaintiff.

*Forbes S. Hascall (George A. Cram,* of counsel), for defendants.

CHANDLER, C. J. (*dissenting*). We have most carefully reviewed the evidence as disclosed by the record before us for the purpose of determining whether the findings of fact by the trial judge find support therein, and from said examination we reach the conclusion that said findings of fact are amply supported by the record here. We are also

in accord with the conclusions of law reached by the lower court and conclude, therefore, that the decree entered on such findings and conclusions should not be disturbed.

Entertaining these views, we have determined to adopt the findings and conclusions of the trial court as conclusive of the questions involved on this appeal.

The opinion of the trial court follows:

"The plaintiff is the owner of acreage traversed by a small watercourse that lies in close proximity to the city of Birmingham. A portion of the city now partially developed, serviced by a sanitary sewer here complained of, found natural surface water drainage in the watercourse. Plaintiff's complaint of pollution resulted in the defendant city installing a mechanically operated pumping device to divert all the dry weather flowage from the watercourse to a sanitary lateral, finding other source of outlet. The pumping device and source of outlet are insufficient to take care of the content of the combined sanitary and storm water flowage at periods of great precipitation incident to heavy rainfalls. On such occasions the surplus finds outlet in the watercourse.

"The defendant city alleges thereby a condition is not created injurious to public health, a nuisance is not established, there is no resultant damage, and pollution, if any, is insignificant and inconsequential.

"The plaintiff, on the other hand, contends that the pumping device has not on all occasions taken care of the dry weather flowage and in addition the city has no right of pollution at any time and that he is entitled to injunctive relief preventing the discharge of any waters showing evidence of contamination.

"The drain and mechanism installed by the city are in accord with 'accepted engineering practices,'

capable of a load up to 900 gallons per minute, ample to accommodate the 'dry weather flow' for an area containing a population of 2,000 and upwards, far in excess of present necessity.

"The defendant city has a right to make a reasonable use of the stream. This principle is expressed in *Attorney General, ex rel. Township of Wyoming, v. City of Grand Rapids,* 175 Mich. 503 (50 L. R. A. [N. S.] 473, Ann. Cas. 1915 A, 968), quoting from page 534, 'Undoubtedly the city has the right to make a reasonable use of the waters of the river as a riparian owner.' The legal determination that confronts us in this case is whether or not the permission of the passage of the surplus waters at the time of great precipitation over the lands of the plaintiff which may to some extent, in diluted content, carry pollution, presents unreasonable use.

"The Court, in a case that went to the extreme in condemning a city for the pollution of the waters of a stream, stated that the matter of reasonable use is a question of fact and further it is incumbent upon him who claims an unreasonable use to make it appear. *Penn American Plate Glass Co.* v. *Schwinn,* 177 Ind. 645, 657 (98 N. E. 715, 719), and other cases cited.

"The Supreme Court of this State, in *Phillips* v. *Village of Armada,* 155 Mich. 260, at pp. 262, 263, announces 'The use of a stream reasonable at one time and one place may become unreasonable at another time and at another place. The reasonable use of a stream must be determined in the light of increased population, of proper sanitary measures and the general welfare of the communities affected. The sewerage of villages and cities has become an absolute necessity for public health. It is not enough to condemn a use as unreasonable because such a use may pollute to some extent the waters of the stream below. Its use by the upper riparian owners may be such as to render it unfit for domestic purposes by man and yet such use may be reasonable.'

"The principle enunciated in *Gundy* v. *Village of Merrill,* 250 Mich. 416, that a village has no right to deposit sewerage in an open ditch in any manner that will cause a nuisance and that a prescriptive right cannot be established to maintain a public nuisance and that an injunction will issue to abate any nuisance so caused is not in conflict with the failure to grant injunctive relief against the deposit of surplus waters at the time of heavy rainfalls in the stream crossing the lands of the plaintiff, nor is the principle afforded by granting injunctive relief in the case of *Attorney General, ex rel. Township of Wyoming,* v. *City of Grand Rapids, supra,* against the deposit of sewerage in a river to the extent of creating a public nuisance, here violated.

"Factually, no damage has been established through the circumstance of the permission of the flow of surplus waters as here outlined, nor has public nuisance been proven. This court is satisfied that the certain circumstances complained of bore relationships to a time prior to the establishment and present workability of the mechanism now used, that the samples obtained by the plaintiff were from a pool where the most unfavorable condition would be reflected and one that would not be free from influences outside of present established devices for the purpose of preventing dry weather flowage from entering the watercourse over plaintiff's lands.

"Defendant certainly is chargeable with a duty less than permanently maintaining a flowage of water in the stream that has the purity essential for drinking purposes. Plaintiff makes no use of the water and therefore has no right of action for disturbance of content from this standpoint. The stream is no more than a ditch, dry most of the time. Defendant city offered evidence that samples analyzed by it presented a state of oxidization taking place affording no injurious circumstances.

"The plaintiff will be denied injunctive relief for the purpose of preventing the surplus flow of water

in excess of the dry weather flowage from finding outlet in the stream. The decree may, however, provide that the city shall at all times be required to take care of the dry weather flowage and provide necessary pumping facilities adequate for any increased demand due to an increased population in the area so that the stream crossing plaintiff's land will only be burdened with such excess and surplus flow incident to heavy precipitation through rainfalls.

"The findings in this case cover the present factual situation and are not to be construed to cover should a circumstance develop from causes here unforeseen, that might result in recognized health authorities finding a circumstance amounting to a public nuisance or a condition injurious to public health.

"A decree may enter without costs."

We find that the decree, a portion of which we quote, protects plaintiff from being unduly burdened by any increase in the amount of flowage from the sewer in question due to any increased demand following any increase in the population in the area served by said sewer.

Those portions of the decree, which we deem important here, we quote:

## I

"That the defendants, particularly the defendant city of Birmingham, has installed in Coolidge highway, so-called, a pumping station sufficient to take care of dry weather flowage of storm water and combined sanitary and storm water flowage to the extent of all dry weather flowage from the area drained by the combined sanitary and storm sewer located in Coolidge highway so-called.

## II

"That the defendant, particularly defendant city of Birmingham, shall not be required to prevent

the surplus. flow of water in excess of the dry weather flowage from finding outlet in the stream crossing the plaintiff's property. The defendants, particularly defendant city of Birmingham, shall be required to take care of the dry weather flowage and provide necessary pumping facilities adequate for any increased demand due to an increased population in the area within the corporate limits of the said defendant city of Birmingham, so that the stream crossing plaintiff's land will only be burdened with such excess and surplus flow incident to heavy precipitation through rainfalls, and the defendant city of Birmingham has the right to have any overflow at such periods drained southerly on Coolidge highway from the pumping station at Maple and Coolidge highway, and that neither plaintiff nor his property are damaged on account thereof and because of the fact that a certain amount of such excess flowage is cast into the watercourse crossing plaintiff's land.

## III

"That the court finds the excess of storm water and sanitary flowage cast into the drain southerly from Maple avenue and occasionally into the watercourse across plaintiff's land has not done and does not do any damage to either plaintiff or plaintiff's land, and that the same has not created and does not create any nuisance and is not injurious to public health, nor does the same constitute any nuisance.

## IV

"That the pumping station now located at the intersection of Maple avenue and Coolidge highway was constructed and is constructed according to accepted engineering practices, and is amply sufficient to take care of all the dry weather flow from the area drained by said combined storm and sanitary sewer in Coolidge highway, and originally drained by the watercourse which crosses plaintiff's land.

### V

"That the Court finds that any pollution cast upon plaintiff's land during periods 'of great precipitation incident to rainfalls was not and is not of sufficient magnitude to do any damage whatsoever to plaintiff and his property.

### VI

"That all injunctive relief prayed for in the bill of complaint be and the same is hereby denied and to the extent of the injunctive relief prayed for in said bill of complaint, said bill of complaint is considered the same as though said bill of complaint were by the opinion and this decree dismissed.

### VII

"That the findings in this case covered the present factual situation and are not to be construed to cover circumstances which may develop from causes here unforeseen, which may result in recognized health authorities finding a circumstance amounting to a public nuisance and should such a circumstance arise in the future, application may be made for further relief within this cause."

It is the duty of this court, which hears chancery cases *de novo,* to weigh all the evidence, and to reach a conclusion in accordance with the just rights of the parties after a review of the entire record. *Petz* v. *Gaines,* 286 Mich. 450; *Hawthorne* v. *Dunn,* 210 Mich. 176. With this rule in mind, we have carefully reviewed not only the evidence as disclosed by the record but also the able briefs filed by counsel for the respective parties, and we are persuaded that the decree entered herein is in accordance with the just rights of the parties.

The findings of fact by the trial court are well supported by competent evidence, and the conclusions of law reached by said court are in accord with the following authorities: *Fox* v. *Holcomb,* 32 Mich. 494;

*Upjohn* v. *Board of Health of Richmond Township*, 46 Mich. 542 (41 Am. Rep. 178) ; *People* v. *Hulbert*, 131 Mich. 156 (64 L. R. A. 265, 100 Am. St. Rep. 588) ; *Phillips* v. *Village of Armada, supra; Smith* v. *Barrett,* 159 Mich. 325 ; *Attorney General, ex rel. Wyoming Township,* v. *City of Grand Rapids, supra; Village of Sand Lake* v. *Allen,* 185 Mich. 1.

The decree should be affirmed with costs.

Boyles, J. The decree entered below allows the city of Birmingham to deposit raw sewage into a watercourse on plaintiff's lands at certain periods, under certain conditions. I cannot agree that the decree should stand. On the record before us the city should be permanently enjoined from continuing a nuisance. The city, in effect, admits that under certain conditions raw sewage is discharged, through the city sewer, across plaintiff's lands. It claims the right to do so because the sewage is diluted at such times by surface water from excessive rainfall. The city's claim is thus stated in its brief:

"It is the general position of appellees that the city of Birmingham has done all that can be required of it to be done and that if any pollution is cast into the little stream across the Dohany property, that it comes only at times of excessive rainfall and is harmless as to its contents, whether definable as sewage or not. * * *

"That the pumping station will take care of all flowage except possibly during severe rainfalls which is all that can be required of a municipality in the handling of its sewer disposal plant and system."

Mr. Corson, the city engineer, admitted that the pumping capacity was not sufficient to prevent some of the contents of this sewer from going over the

six-inch dam constructed by defendants, into the watercourse, and across plaintiff's lands. The extent to which the city claims the right to do this was thus explained by the city engineer:

"*Q.* Mr. Corson, do you know whether or not the city of Birmingham, one of the defendants in this case, claims the right to discharge sewage through this sewer in question into this open watercourse that carries over on to the Dohany property, whether that sewage be much or little.

"*A.* It does not claim that right undiluted.

"*Q.* It does then claim the right to gather sewage and discharge it through this sewer into the open watercourse that leads down on to the Dohany property, if the sewage is diluted to some extent, is that right?

"*A.* To a considerable extent, yes, sir.

"*Q.* What is that extent?

"*A.* Under the present conditions—

"*Q.* No, just answer, just what is that extent that it has got to be diluted?

"*A.* About one part of sewage to five of water."

Mr. Dance, the city director of public works, admitted that the pumping station was operated by manual switches; that sewage goes down across plaintiff's lands if the pumps are cut off, and that whenever the six-inch dam was filled the overflow went on down into plaintiff's watercourse. It was also shown that there were 30 inches of accumulated raw sewage or "sludge" at the bottom of the sewer manhole, beyond the capacity of the pumps; that this accumulation was churned up by any unusual flow of surface water and thus carried on down into plaintiff's watercourse. This accumulation is sewage and the solids in this accumulation are human excrement.

Plaintiff acquired the lands in question in 1916, at a first cost of $12,000, since which time plaintiff has expended thereon in taxes approximately $7,000. The land is about 21 acres in extent, partly woodland, lies about six miles from the city limits of Detroit, and closely adjacent to other residential districts. It was acquired for residential purposes, and is traversed by a meandering natural watercourse, with a channel and well-defined banks. At times the watercourse is dry. It is the outlet for raw sewage discharged from the sewer in question whenever there is a heavy rainfall. The outlet of the sewer empties into a small pool from which the contents of the sewer pass across plaintiff's land from a short ditch along the highway. No part of plaintiff's land lies within the corporate limits of the city. There was no pollution of this watercourse before the sewer was constructed.

As soon as the sewer was completed it began to deposit raw sewage into the watercourse. Night soil and the usual complement of raw sewage was deposited therein. The stench became terrible and plaintiff started suit in August, 1939, to abate the nuisance. In October, 1939, the city installed and put into operation a six-inch dam and pumping station at the lower end of the upper (42-inch) part of the sewer. The purpose was to divert the contents of the sewer by means of the dam and pumping station through an eight-inch pipe, and, eventually, through a disposal plant. Admittedly, this construction does not take care of all of the raw sewage. After a heavy rainfall the contents of the sewer rise above the six-inch dam and are carried on down across plaintiff's land.

Some six months after the dam and pumping station were put into operation plaintiff obtained samples of the sewage discharged across his land. These samples were taken each week for a period

of 12 consecutive weeks during the months of April, May, and June. The 12 samples were analyzed and brought into court as evidence. Three different chemists testified that these samples contained all of the usual elements of sewage,—abundant chlorides, hydrogen sulphide, active bacilli coli, ammonia and insoluble solids. At that time human excrement was still being deposited on plaintiff's land. The stench continued and was such that a nearby resident was, at times, compelled to keep the windows of his house closed.

To sustain its position the city relies upon cases holding that a riparian owner is allowed reasonable use of a natural watercourse in common with other riparian owners, even to the extent of a certain amount of pollution. *People* v. *Hulbert,* 131 Mich. 156 (64 L. R. A. 265, 100 Am. St. Rep. 588) ; *Monroe Carp Pond Co.* v. *River Raisin Paper Co.,* 240 Mich. 279. The rights of a riparian owner are not involved in the case at bar. No part of the natural watercourse lies within the corporate limits of the defendant city. The city is not a riparian owner. *Monroe Carp Pond Co.* v. *River Raisin Paper Co., supra.* Defendants claim their position is analogous to that of a riparian owner because surface water finds its natural outlet in plaintiff's watercourse. It does not follow that the city may make an unreasonable use of plaintiff's watercourse for disposing of raw sewage.

Equity has jurisdiction to restrain the pollution of a watercourse by casting sewage therein in quantity sufficient to occasion a nuisance. No public necessity warrants a city in injuring the rights of riparian owners by polluting a stream with its sewers; such rights are protected by the Constitution and cannot be taken away except by due process of law.* *Attorney General, ex rel. Township of Wyo-*

---

* See Const. 1908, Art. 2, § 16.—REPORTER.

*ming*, v. *City of Grand Rapids*, 175 Mich. 503 (50 L.
R. A. [N. S.] 473, Ann. Cas. 1915 A. 968); *Gundy* v.
*Village of Merrill*, 250 Mich. 416. It cannot be suc-
cessfully maintained that the duty of the city to
care for its sewage disposal continues only during
the time of normal weather and ends when there is
an excessive rainfall. Nor does plaintiff's right to
have the nuisance abated depend upon the use of
water from the natural watercourse for drinking or
domestic purposes. The value of plaintiff's land is
materially lessened when sewage is discharged
across his land with the attendant bad odors and the
visible evidence of human excrement.

The decree entered below holds that the dam and
pumping station, installed by the city since the suit
was started, is adequate to take care of the dry
weather flowage from the combined storm water
and sanitary sewer, and that the city is not required
to prevent the surplus flow from finding an outlet, at
other times, across plaintiff's property. This is not
sufficient. A decree may be entered allowing the city
a reasonable length of time to make the necessary
improvements and permanently enjoining defend-
ants from thereafter discharging raw sewage into
the watercourse on or across plaintiff's land, with
costs to plaintiff.

North, Starr, Wiest, Butzel, Bushnell, and
Sharpe, JJ., concurred with Boyles, J.