### WHITE LAKE IMPROVEMENT ASSOCIATION
#### *v.* CITY OF WHITEHALL

1. WATERS AND WATERCOURSES—POLLUTION—WATER RESOURCES COMMISSION ACT.

   The water resources commission act contains the procedural and substantive framework for elimination of water pollution and underscores the state's public policy in this area as expressed in the state constitution (MCLA § 323.1 *et seq.;* Const 1963, art 4, § 52).

2. COURTS—JURISDICTION—PRIMARY JURISDICTION—ADMINISTRATIVE LAW AND PROCEDURE.

   The doctrine of primary jurisdiction governs only the question of whether a court or an agency will initially decide an issue but not whether a court or agency will finally decide the issue; consequently, the doctrine does not preclude civil litigation, it merely suspends court action.

3. NUISANCE—PRIVATE NUISANCE—PUBLIC NUISANCE.

   A nuisance may be a public nuisance and a private nuisance simultaneously.

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  56 Am Jur, Waters § 420 *et seq.*
[2, 13]  1 Am Jur 2d, Administrative Law §§ 15–22, 776–**797.**
[3]  39 Am Jur, Nuisances §§ 6–9.
[4]  56 Am Jur, Waters § 411.
[5]  56 Am Jur, Waters §§ 37, 39, 390, 420 *et seq.*
[6]  56 Am Jur, Waters §§ 35, 433.
[7, 13, 14]  6 Am Jur 2d, Associations and Clubs §§ 51–**53.**
[8]  56 Am Jur, Waters §§ 386, 392, 407, 408.
[9, 10, 15]  56 Am Jur, Waters § 420 *et seq.*
[11]  56 Am Jur, Waters §§ 395, 417.
[12]  56 Am Jur, Waters §§ 395, 399, 417, 427.
[16]  2 Am Jur 2d, Administrative Law §§ 788–797.
[17, 18]  2 Am Jur 2d, Administrative Law § 789.
[19]  2 Am Jur 2d, Administrative Law §§ 595–609.
[20]  2 Am Jur 2d, Administrative Law § 599.
[21]  2 Am Jur 2d, Administrative Law §§ 792–794.
[22]  2 Am Jur 2d, Administrative Law §§ 596, 599, 709–711, **780.**

4. WATERS AND WATER COURSES—NUISANCE—PRIVATE NUISANCE— ABATEMENT—ACTION—RIPARIAN RIGHTS.

Riparian landowners may commence an action to abate a private nuisance affecting waters adjacent to their lands.

5. NUISANCE—ABATEMENT—PARTIES—PROPER PARTY—ASSOCIATIONS.

Plaintiff lake improvement association is a proper party plaintiff to abate a private nuisance polluting a lake, even though the association itself is not a riparian landowner where the sole purpose of that association is to represent the interests of its members, many of whom are riparian landowners, and where no constructive purpose would be served by requiring association members, who are riparian owners, to maintain the abatement action individually rather than through their association.

6. NUISANCE—ABATEMENT—PARTIES—LIMITATION OF ACTIONS.

Limiting the persons who may maintain an action for the abatement of a nuisance insures that only those who have a substantial interest will be allowed to come into court to complain.

7. NUISANCE — PRIVATE NUISANCE — ABATEMENT — PARTIES — PROPER PARTY — ASSOCIATIONS — CORPORATIONS — NONPROFIT.

Nonprofit lake improvement association had an adequate interest to entitle it to maintain an action to abate a private nuisance, *i.e.*, pollution of a lake, to vindicate the interests of its members, many of whom were riparian landowners.

8. WATERS AND WATER COURSES—MUNICIPAL POLLUTION—STATUTES —WATER RESOURCES ACT.

A provision of the water resources commission act dealing with actions against a municipality for permitting, allowing or suffering its inhabitants to discharge raw human sewage into state waters, is not the exclusive remedy available against a municipality which itself is discharging inadequately treated municipal wastes into state waters since that statutory provision does not relieve a municipality of its common law liability for so discharging (MCLA § 323.6[b]).

9. WATERS AND WATER COURSES—POLLUTION—WATER RESOURCES COMMISSION.

The water resources commission, after determining that any person has violated or is about to violate the provisions of the water resources commission act, or is failing to control the polluting content or substance discharged or to be dis-

charged into any state waters may notify the offender of its determination and set a date for a hearing at which any interested party may appear, present witnesses and submit evidence (MCLA § 323.7).

10. WATERS AND WATER COURSES—STATUTES—POLLUTION—WATER RESOURCES COMMISSION—GRIEVANCES—ADMINISTRATIVE LAW AND PROCEDURE.

Any person who feels aggrieved by the restriction of polluting content or of any other order of the water resources commission has a right to petition the commission for a public hearing and the final order of that commission is conclusive unless it is ultimately reviewed through the courts under the administrative procedure act (MCLA §§ 323.8, 24.101 et seq.).

11. WATERS AND WATER COURSES—STATUTES—POLLUTION—WATER RESOURCES COMMISSION—AGREEMENTS WITH POLLUTERS.

Pollution abatement agreements between the water resources commission and pollution offenders must be treated as orders of that commission capable of being attacked by interested or aggrieved parties since the public accountability procedures of the water resources commission act cannot be avoided by substituting such agreements for the statutory hearing resulting in a commission order (MCLA §§ 323.7, 323.8).

12. WATERS AND WATER COURSES—POLLUTION—STATUTES—WATER RESOURCES COMMISSION—PARTIES.

Interested or aggrieved parties who have not consented to the provisions of pollution abatement agreements between the water resources commission and pollution offenders are not bound by such agreements since the orders of that commission are conclusive only as to those who have had an opportunity to attend a hearing on the matter as required by statute (MCLA §§ 323.7, 323.8).

13. ADMINISTRATIVE LAW AND PROCEDURE — WATERS AND WATER COURSES—STATUTES—POLLUTION ABATEMENT AGREEMENTS.

Plaintiff lake improvement association could challenge administratively the sufficiency of pollution abatement agreements between the water resources commission and defendant polluters concluded without the required statutory hearing, where such an administrative attack would not unduly impede defendants in fulfilling their undertakings under those agree-

ments which did not require defendants to construct sewage treatment facilities until December 1, 1970 and August 1, 1971 (MCLA §§ 323.7, 323.8).

14. WATERS AND WATER COURSES—POLLUTION—AGGRIEVED PERSON—STATUTES.

The words "aggrieved person" as used in the water resources commission act includes nonprofit conservation and other eleemosynary associations which have exhibited a special interest in protecting the public's recreational rights in certain areas by seeking to abate a water pollution nuisance there in civil litigation.

15. WATERS AND WATER COURSES—NUISANCE—ABATEMENT—PARTIES —COMMON LAW.

A proper party may sue for damages or seek injunctive relief to abate a water pollution nuisance, such actions having been brought both before and after the enactment of the water resources commission act which itself contemplates that existing common law remedies are not abolished (MCLA §§ 323-.6(d), 323.12).

16. ADMINISTRATIVE LAW AND PROCEDURE—JURISDICTION.

The doctrine of primary jurisdiction operates where courts and administrative agencies have concurrent jurisdiction, *i.e.*, where courts have the power to enjoin a particular act and administrative agencies have the power to regulate and to prohibit that same act.

17. ADMINISTRATIVE LAW AND PROCEDURE—JURISDICTION.

Administrative agencies created to regulate a particular subject matter should not be passed over in cases raising issues of fact not within the conventional experience of judges or requiring the exercise of administrative discretion since the limited functions of judicial review are more rationally exercised by preliminary resort to the findings of specialized agencies which are better equipped to ascertain and interpret the circumstances underlying the legal issues involved.

18. ADMINISTRATIVE LAW AND PROCEDURE—PRIMARY JURISDICTION.

The principal reason behind the doctrine of primary jurisdiction is recognition of the need for orderly and sensible coordination of the work of courts and of administrative agen-

cies and, whether an agency is expert or not, a court should not act upon subject matter that is peculiarly within that agency's specialized field without taking into account what that agency has to offer; otherwise parties subject to that agency's continuous regulation may become the victims of uncoordinated and conflicting requirements.

19. Administrative Law and Procedure—Exhaustion of Remedies—Judicial Review.

Exhaustion of administrative remedies is required before a plaintiff can obtain judicial review of administrative agency orders under the administrative procedure act (MCLA § 24.101 *et seq.*).

20. Administrative Law and Procedure—Exhaustion of Remedies—Waters and Water Courses—Pollution.

Plaintiff lake improvement association is first required to challenge administratively the orders of the water resources commission regarding defendants' pollution of lake and then, if dissatisfied with that commission's disposition of its claims, cannot only obtain a judicial review of those orders but also seek again equitable abatement of the pollution nuisance if it still feels aggrieved and entitled to equitable relief.

21. Administrative Law and Procedure—Jurisdiction.

There are no absolutes in determining questions of primary jurisdiction between courts and administrative agencies; hence, each case must be decided on its own facts.

22. Waters and Water Courses—Pollution—Nuisance—Abatement—Equity—Administrative Law and Procedure.

Equitable abatement of a water pollution nuisance would not be granted where plaintiff lake improvement association failed to show that equitable intervention was immediately required to preserve the status quo, since the pollution conditions complained of had existed for a considerable period of time, and there was no showing that effective relief could not be obtained in a proceeding before the water resources commission.

Appeal from Muskegon, Albert Engel, J. Submitted Division 3 January 10, 1969, at Grand Rapids. (Docket No. 5,223.) Decided February 27, 1970.

Complaint by the White Lake Improvement Association, a nonprofit Michigan corporation, against the City of Whitehall, a Michigan municipal corporation and the Whitehall Leather Company, a Tennessee corporation, and its agents for the abatement of a pollution nuisance and injunctive relief. Accelerated judgment for defendants. Plaintiff appeals. Affirmed.

*A. Winston Dahlstrom,* for plaintiff.

*Cochran, Vander Ploeg & Grimm,* for defendant City of Whitehall.

*Hathaway, Latimer, Clink & Robb (William F. Kerr,* of counsel), for defendant Whitehall Leather Company and its agents, Ernest Stein and Kenneth Folger.

Before: HOLBROOK, P. J., and ROBERT B. BURNS and LEVIN, JJ.

LEVIN, J. The fight against pollution of natural resources has in recent times become a cause célèbre.[1] Along with the increasing recognition of

---

[1] In particular, water pollution has been the subject of growing study and concern. There has been ample documentation of the dimensions of the water pollution crisis. Official reports describing the pollution of Michigan waters are collected in Michigan's Water Problems (Humphrys ed), a 1967 publication of the Department of Resource Development, in cooperation with the Institute of Water Research, Michigan State University.

The threatened aquacide of the Great Lakes is described in Proceedings, the Pollution of Lake Erie and its Tributaries, U. S. Department of the Interior, Federal Water Control Administration (1966); Proceedings, Pollution of Lake Michigan and its Tributary Basin, U. S. Department of the Interior, Federal Water Control Administration (1968).

Growing national interest in the pollution problem is reflected in Senate hearings which have increasingly focused on the serious consequences of continued governmental inaction. See Hearings, Subcommittee on Air and Water Pollution, Committee on Public

the importance of this effort, there has developed a feeling of futility when confronted with the overwhelming array of vested interests which are the often adventitious polluters.[2]

In this case a nonprofit conservation association is attempting to eliminate the pollution of White Lake. It is undisputed that both defendants, the city of Whitehall and Whitehall Leather Company, discharge improperly treated municipal and industrial wastes into White Lake.

The plaintiff, White Lake Improvement Association, is a nonprofit membership corporation organized under the laws of this State in 1951. There are approximately 414 members of the association, many of whom own land bordering White Lake.[3] The association itself owns no land. The stated purpose of the association is to prevent the pollution of White Lake, to promote cleanliness and good sanitary conditions around the lake and the public welfare of the area.

The complaint seeks the abatement of the nuisance caused by the materials the defendants dump and injunctive relief. The trial judge granted accelerated judgments dismissing the action on the ground that the association had no standing to complain. He also ruled that the Water Resources Commission Act[4] provides the exclusive remedy against

Works, United States Senate 89th, 90th, and 91st Congress (1965–1969). See, also, this Subcommittee's Hearings, Thermal Pollution, 90th Congress, 2d Session (1969).

[2] See, for example, Galbraith, Polipollutionists: Movement for the Survival of Pollution, 217 Atlantic Monthly 52 (1967); Krease, Why Water Pollution is Economically Unavoidable, 5 Trans-Action 31 (1968).

[3] Of those members who responded to interrogatories put by the defendants over 50 claimed they owned land fronting on White Lake.

[4] MCLA § 323.1, et seq. (Stat Ann 1969 Rev § 3.521, et seq.)

See, generally, Joseph G. Molner, M. D., Prevention of Pollution of Michigan Water Resources, 37 U of Detroit L J 144 (1959); N. William Hines, Nor Any Drop to Drink: Public Regulation of Water Quality, 52 Iowa L Rev 186, 201 (1966).

municipalities. This appeal presents the issue of the scope of the association's remedies to prevent the continued eutrophication of White Lake.

The Water Resources Commission Act contains a comprehensive procedural and substantive framework for the elimination of water pollution. Originally enacted in 1929 and frequently amended,[5] the act underscores the public policy of this State expressed in the Constitution of 1963, art 4, § 52:

"The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction."

On October 16, 1968 (subsequent to the filing of the complaint in this action on June 29, 1967 and the final judgment on February 20, 1968), the water resources commission entered into an agreement with the city of Whitehall which, by stipulation of the parties, is part of the record on appeal. The city agreed to complete by October 1, 1972 a sewage treatment facility which fulfills specifications in the agreement. On December 5, 1968 a similar agreement was entered into between the commission and Whitehall Leather Company; the completion date is December 1, 1971.

The association suggests that the efforts of the water resources commission have been futile due to understaffed offices, insufficient funds and political pressures. Its brief filed with our Court asserts:

"No citizen of Michigan today can feel very secure against the devastating effects of water pollution

5 PA 1929, No 245; PA 1941, No 131; PA 1947, No 216; PA 1949, No 117; PA 1965, Nos 328, 405; PA 1968, No 167.

by simply reading Act 245 and kidding himself in-to believing that 'the law' as stated in the Act will somehow cure the problem. It hasn't cured the problem—and we've had the law since 1929."

The association says that only in the courts can it obtain meaningful relief.[6] Further, it asks us to overrule the universally accepted doctrine that only one who suffers harm different in kind from that suffered by the public generally may maintain an action for the abatement of a public nuisance.[7] While we recognize that the standing of nonprofit corporations to challenge proposed action of an administrative agency has been recognized,[8] no case has been cited where a court has, even for a clearly publicly motivated group, made an exception to the "different in kind" standing requirement which for so long has been a feature of the law of public nuisance. Be that as it may, there is no need to address ourselves to this sweeping claim of the plaintiff association in order to decide this case.

For reasons which we will now relate, we have concluded that the association had the necessary

[6] A general description of attempts to restrain pollution through the courts in various jurisdictions is found in Stein, Problems and Programs in Water Pollution, 2 National Resources Journal 388 (1962). See, also, footnote 37 and accompanying text.

[7] See Harper and James, The Law of Torts, § 1.23, p 64; 39 Am Jur, Nuisances, § 124, pp 379, 380; *Morse* v. *Liquor Control Commission* (1947), 319 Mich 52, 58, 59.

See, also, N. William Hines, Nor Any Drop to Drink: Public Regulation of Water Quality, 52 Iowa L Rev 186, 196, *et seq.* (1966).

In this connection see, however, Sax, The Public Trust Doctrine in National Resource Law: Effective Judicial Intervention, 68 Mich L Rev 471, 485 (1970), which shows that private citizens have in a number of cases been allowed to maintain actions challenging appropriations of the public domain (*e.g.*, park lands, the foreshore, and the waters of the foreshore and the larger lakes, rivers and streams). See *Township of Grosse Ile* v. *Dunbar & Sullivan Dredging Co.* (1969), 15 Mich App 556, 566: "The title of a riparian owner in the bed of a navigable river is subject to a public trust for the preservation of the public right of navigation, fishing, and other activities."

[8] See footnote 23 and accompanying text.

standing to commence this action to abate a private nuisance and that the act does not provide an exclusive remedy. We, nevertheless, affirm the judgment dismissing the complaint because we have also concluded that the defendants are correct in their contention that primary jurisdiction of this controversy is now in the commission.

## I.

### *The Association Has Standing To Maintain This Action*

Although we affirm the trial judge's dismissal of the complaint, we think that the plaintiff association is entitled to have its right to maintain this action clarified. The doctrine of primary jurisdiction does not preclude civil litigation; it merely suspends court action. The association may be entirely justified in proceeding with this litigation after it pursues its administrative remedy before the water resources commission.

"The doctrine of primary jurisdiction   *   *   * governs only the question whether court or agency will *initially* decide a particular issue, not the question whether court or agency will *finally* decide the issue." (Emphasis by author.) 3 Davis, Administrative Law Treatise, § 19.01, p 3.

"Court jurisdiction is not thereby ousted, but only postponed." *United States* v. *The Philadelphia National Bank* (1963), 374 US 321, 353 (83 S Ct 1715, 10 L Ed 2d 915).

A nuisance may at the same time be both a public and private nuisance.[9] Thus, without deciding whether the pollution of White Lake constitutes a

---

[9] *Board of Water Commissioners of Detroit* v. *City of Detroit* (1898), 117 Mich 458, 461, 462.

public nuisance[10] and whether the plaintiff association has standing to complain of a public nuisance, if the pollution of White Lake constitutes a private nuisance the association can maintain this action if it has the necessary standing to commence an action for the abatement of a private nuisance.

Where a private nuisance affects water, a riparian landowner may commence an action for its abatement.[11] True, the plaintiff association owns no land, but its sole purpose is to represent the interest of its members, many of whom are riparian landowners, in preventing the pollution of White Lake.

No constructive purpose would be served by requiring the members of the plaintiff association who are riparian owners to maintain this action individually and thereby require that they seek in some other fashion financial and other support from the other affected landowners. Additionally, allowing the landowners to associate together for this purpose may avoid a multiplicity of suits; the difficulties that are likely to be encountered where there are a large number of plaintiffs are all too familiar to anyone who has had experience in such litigation. The most expedient way for the riparian

---

[10] See Restatement, Torts, 2d, tentative draft 15, § 821B, comment g.

[11] *Dohany* v. *City of Birmingham* (1942), 301 Mich 30, 41, 42.

In the eastern and midwestern parts of the United States, where water is comparatively plentiful, water law has developed in terms of the rights of riparian owners. (In the western States, where water is scarce, the doctrine of prior appropriation, *i.e.*, first-in-time-first-in-right, largely governs.)

Each riparian owner is entitled to the "reasonable enjoyment of the common right." *Dumont* v. *Kellogg* (1874), 29 Mich 420, 425. This rule also governs the use of those who acquire access to the water by easement, license and right-of-way. *Thompson* v. *Enz* (1967), 379 Mich 667, 686, 687 (such rights of use can be created, even though riparian rights cannot be conveyed or assigned). The question of what constitutes a reasonable use has been the subject of much litigation; see *Hoover* v. *Crane* (1960), 362 Mich 36, and cases there cited. See, also, *Phillips* v. *Village of Armada* (1908), 155 Mich 260, 262, 263.

owners to obtain a determination on the merits is to allow them to combine and join together for this purpose with others of a like interest under a single banner both before and at the time of suit: "The only practical judicial policy when people pool their capital, their interests or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all."[12]

The purpose of the rules of law which limit the persons who may maintain an action for the abatement of a nuisance is similar to a purpose of standing requirements generally, namely, to insure that only those who have a substantial interest will be allowed to come into court to complain.[13]

---

[12] *Joint Anti-Fascist Refugee Committee* v. *McGrath* (1951), 341 US 123, 187 (71 S Ct 624, 95 L Ed 817) (per Jackson, J.). This statement has been cited with approval in later opinions of the court. See *NAACP* v. *Patterson* (1958), 357 US 449, 459 (78 S Ct 1163, 2 L Ed 2d 1488); *Bantam Books, Inc.* v. *Sullivan* (1963), 372 US 58, 64 (83 S Ct 631, 9 L Ed 2d 584).

[13] *Cf. Flast* v. *Cohen* (1968), 392 US 83, 98–100 (88 S Ct 1942, 20 L Ed 2d 947), where the United States Supreme Court observed:

"Standing is an aspect of justiciability and, as such, the problem of standing is surrounded by the same complexities and vagaries that inhere in justiciability. Standing has been called one of 'the most amorphous [concepts] in the entire domain of public law.' Some of the complexities peculiar to standing problems result because standing 'serves, on occasion, as a shorthand expression for all the various elements of justiciability.' In addition, there are at work in the standing doctrine the many subtle pressures which tend to cause policy considerations to blend into constitutional limitations. * * *

"The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' *Baker* v. *Carr* (1962), 369 US 186, 204 (82 S Ct 691, 7 L Ed 2d 663). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable."

Similarly see *Office of Communication of the United Church of Christ* v. *Federal Communications Commission* (1966), 123 US App DC 328 (359 F2d 994, 1000, *et seq.*).

In *Morse* v. *Liquor Control Commission* (1947), 319 Mich 52, the plaintiffs, who were members of churches alleged to be within 500 feet of the defendant liquor licensee, asserted that the sale of liquor by the licensee would constitute both a public and private nuisance. The plaintiffs brought the action in their own names, not on behalf of the churches to which they belonged. The Michigan Supreme Court discussed the law of public and private nuisance and concluded that the plaintiffs were proper parties plaintiff. In reaching that decision the Court necessarily ignored the fact that the plaintiffs did not themselves own property located within 500 feet of the churches.

In other cases as well it has been recognized that a nonprofit corporation may have standing to maintain an action to vindicate the interests of its members.[14]

Having in mind the function of the standing requirement, we are satisfied that the plaintiff association has an adequate interest to entitle it to maintain this action to the extent it seeks abatement of a private nuisance.

## II.

### *The Water Resources Commission Act Does Not Provide An Exclusive Remedy*

The trial judge relied on section 6(b) of the act[15] in holding that it provides the exclusive remedy

---

[14] *NAACP* v. *Button* (1963), 371 US 415, 428 (83 S Ct 328, 9 L Ed 2d 405); *Louisiana* v. *NAACP* (1961), 366 US 293, 296 (81 S Ct 1333, 6 L Ed 2d 301). *Smith* v. *Board of Education of Morrilton School District No 32* (CA 8, 1966), 365 F2d 770, 771. *Cf. Baltimore & P. R. Co.* v. *Fifth Baptist Church* (1883), 108 US 317, 329, 330 (2 S Ct 719, 27 L Ed 739); *Environmental Defense Fund, Inc.* v. *Director of Agriculture Department* (1968), 11 Mich App 693.

[15] "The discharge of any raw sewage of human origin, directly or indirectly into any of the waters of the state shall be con-

against a municipality.   Section 6(b) is concerned,
however, with the discharge of raw sewage of human
origin from land occupied by the landowner him-
self rather than with the discharge of sewage by
a municipality.   Section 6(b) seeks to confine the
remedy against the city for "permitting, allowing
or suffering" land occupiers to discharge such sew-
age into the waters.   It does not purport to relieve
the municipality from its common law liability for
its own actions in discharging sewage.[16]   In this
case the complaint against the defendant city does
not charge it with permitting, allowing or suffering
others to discharge raw sewage of human origin
into the waters but rather that the city itself is dis-
charging into White Lake inadequately treated
sewage of various origins.

---

sidered *prima facie* evidence of the violation of section 6(a) of
this act unless said discharge shall have been permitted by any
order, rule or regulation of the commission.   Any city, village or
township which permits, allows or suffers the discharge of such raw
sewage of human origin into any of the waters of the state by
any of its inhabitants or persons occupying lands from which said
raw sewage originates, shall be subject only to the remedies provided
for in section 7 of this act."   MCLA § 323.6(b)   (Stat Ann 1969
Rev § 3.526(b)).

[16] Adoption of the construction placed on the act by the defend-
ant city would raise a serious issue as to the constitutionality of
section 6(b) as that construction, for all practical purposes, elimi-
nates altogether the judicial remedy for injury caused by munic-
ipally discharged sewage.   Clearly a person who can show damage
to a property interest caused by such sewage has a right to hold
someone liable for his loss.   *Cf. Dohany* v. *City of Birmingham,
supra.*   Under the construction which we place on the act he may
sue the land occupier, who presumably is identifiable, in the kind
of case where the remedy against the city has been eliminated and
the city itself where the user of the city sewer is not identifiable
and the city is discharging the waste in the water.

## III.

### *The Association Has A Remedy Before*
### *The Water Resources Commission*

Section 7[17] of the act provides:

"Whenever in the opinion of the commission any person shall violate or is about to violate the provisions of this act, or fails to control the polluting content or substance discharged or to be discharged into any waters of the State, the commission may notify the alleged offender of such determination by the commission."

Section 7 then goes on to provide as to the form of the notice of a hearing, that "At such hearing any interested party may appear, present witnesses and submit evidence," and that the final order of determination of the commission shall be conclusive unless reviewed in accordance with the provisions of the administrative procedure act.[18]

Section 8[19] of the act provides that "any person [who] shall feel himself aggrieved by the restriction of polluting content, waste or pollution, or any other order of the commission" has the right to petition the water resources commission for a public hearing with ultimate review through the courts under the administrative procedure act.

For purposes of §§ 7 and 8, agreements entered into by the water resources commission, like those between the commission and the defendants, which agreements are about to be acted upon by the defendants and serve as the stimulus for the expenditure of great sums of money, agreements which, the defendants assert, make unnecessary the con-

---

[17] MCLA § 323.7 (Stat Ann 1969 Rev § 3.527).
[18] MCLA § 24.101 *et seq.* (Stat Ann 1969 Rev § 3.560[21.1] *et seq.*).
[19] MCLA § 323.8 (Stat Ann 1969 Rev § 3.528).

tinuance of this litigation, must be treated as "orders" of the commission capable of being attacked by those interested or aggrieved. This is not to say that such agreements may not be entered into, but rather that the public accountability contemplated by the procedures set forth in §§ 7 and 8 of this act cannot be avoided by the use of an "agreement" as a substitute for the statutory hearing resulting in an order provided for in the act.

Those interested or aggrieved who have not consented to the provisions of these agreements are not bound by them. Section 7 contemplates that orders of the commission are conclusive only as to those who have had an opportunity to be present at a hearing.[20] The same analysis is applicable to an agreement which functions as an order. Since the hearing contemplated by the statute ("at which any interested party may appear, present witnesses and submit evidence") has never been held, the association may yet challenge the sufficiency of the provisions of these agreements.[21] As a practical matter, allowing the association to attack the agreements administratively at this date should not unduly impede the defendants in fulfilling their undertakings. Construction of the sewage treatment facilities is not required to be commenced until December 1, 1970 (as to the leather company) and until August 1, 1971 (as to the city).

We agree with the defendant city that the association is an "aggrieved person" capable of challenging a commission order under § 8; it is like-

[20] See *Dation* v. *Ford Motor Co.* (1946), 314 Mich 152, 167; *Trellsite Foundry & Stamping Company* v. *Enterprise Foundry* (1961), 365 Mich 209, 217, concerning the need for a hearing and notice if the administrative order is to affect private property rights.
[21] If a hearing had been scheduled, persons duly notified of the hearing would, of course, have had to act timely to protect their rights under the act.

wise "interested" under § 7. The word "person" is defined in § 11[22] "to include any municipality, industry, public or private corporation, co-partnership, firm or any other entity whatsoever." The term "aggrieved" has been interpreted in similar statutes in other jurisdictions to include nonprofit conservation and other eleemosynary associations.[23]

In *Scenic Hudson Preservation Conference* v. *Federal Power Commission* (CA 2, 1965), 354 F2d 608, 616, *certiorari denied* 384 US 941 (86 S Ct 1462, 16 L Ed 2d 540), the United States Court of Appeals for the Second Circuit declared:

"In order to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic, conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be included in the class of 'aggrieved' parties under [the act]."

The court rejected the argument that allowing intervention by public spirited organizations will encourage "literally thousands" to intervene. It observed, in language also pertinent to the standing of the plaintiff association to seek abatement of a nuisance in civil litigation (see part I, *supra*) (p 617), "No such horrendous possibilities exist. Our experience with public actions confirms the view that

---

[22] MCLA § 323.11 (Stat Ann 1969 Rev § 3.531).

[23] *Office of Communication of the United Church of Christ* v. *Federal Communications Commission* (1966), 123 US App DC 328 (359 F2d 994, 1000); *Associated Industries of New York State* v. *Ickes* (CA 2, 1943), 134 F2d 694; *Powelton Civic Home Owners Association* v. *Department of Housing and Urban Development* (ED Pa, 1968), 284 F Supp 809, 820; *Road Review League* v. *Town of Bedford* (SD NY, 1967), 270 F Supp 650, 660; *International Chemical Workers Union* v. *Planters Manufacturing Co.* (ND Miss, 1966), 259 F Supp 365; *Reade* v. *Ewing* (CA 2, 1953), 205 F2d 630. *Cf. Nashville I-40 Steering Committee* v. *Ellington* (CA 6, 1967), 387 F2d 179, 182. See, generally, Jaffe, Standing to Secure Judicial Review; Public Actions, 74 Harv L Rev 1265 (1961); Private Actions, 75 Harv L Rev 255 (1961).

the expense and vexation of legal proceedings is not lightly undertaken."[24]

## IV.

*Primary Jurisdiction Is Now In The Commission*

Simply to find that the plaintiff has an avenue of review under the Water Resources Commission Act does not conclude our analysis of this case. Whether the association should be compelled to seek redress through the administrative channel before it is allowed to continue this action poses a different and difficult issue.

It is well established that a proper party may sue for damages or seek injunctive relief to abate a nuisance such as water pollution. Both before and after the enactment of the Water Resources Commission Act, such actions have been brought.[25] The act itself contemplates that existing common law remedies are not abolished.[26] But it is in just such a case, one of

[24] Similarly, see *Office of Communication of the United Church of Christ* v. *Federal Communications Commission* (CADC, 1969) 425 F 2d 543, n 2.

The defendant Whitehall Leather Company makes a similar assertion in its brief in support of its contention that the commission has primary jurisdiction.

[25] *Dohany* v. *City of Birmingham, supra; Attorney General, ex rel. Township of Wyoming,* v. *City of Grand Rapids* (1913), 175 Mich 503. See, also, *Gundy* v. *Village of Merrill* (1930), 250 Mich 416.

[26] "Any violation of any provision of section 6 [unlawful discharge into waters] shall be *prima facie* evidence of the existence of a public nuisance and in addition to the remedies provided for in this act may be abated according to law in an action brought by the attorney general in a court of competent jurisdiction." Section 6(d) (MCLA § 323.6(d) [Stat Ann 1969 Rev § 3.526(d)]). See *Attorney General, ex rel. Township of Wyoming,* v. *City of Grand Rapids* (1913), 175 Mich 503, 533.

"This act shall not be construed as repealing any of the provisions of the law governing the pollution of lakes and streams, but shall be held and construed as ancillary to and supplementing the same and in addition to the laws now in force, except as the same may be in direct conflict herewith." Section 12 (MCLA § 323.12 [Stat Ann 1969 Rev § 3.532]).

concurrent jurisdiction of the courts (to enjoin a nuisance) and of an administrative agency (to regulate and prohibit pollution) that the doctrine of primary jurisdiction operates.

The primary jurisdiction doctrine[27] has been explained as follows:

"In cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts ·after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." *Far East Conference* v. *United States*

The attorney general has ruled that the Water Resources Commission does not have exclusive jurisdiction to regulate and prohibit pollution:

"The right to control pollution of the waters of the state are vested in the first instance in the aggrieved individual citizen who may be affected by said pollution, either by an objectionable nuisance created, the material effect upon his lands, or the danger to his stock, himself, or his family, created by such pollution. The instances in which the courts have upheld this doctrine are too numerous to need citation." OAG 1949, No 1056, p 3.

The Pennsylvania Supreme Court interpreted its pollution statute to supplement existing common law remedies in *Commonwealth, ex rel. Shumaker,* v. *New York & P. R. Co.* (1951), 367 Pa 40 (79 A2d 439); similarly, see *Urie* v. *Franconia Paper Corp.* (1966), 107 NH 131 (218 A2d 360); *People* v. *City of Los Angeles* (1958), 160 Cal App 2d 494 (325 P2d 639, 645).

[27] See, generally, Louis L. Jaffe, Primary Jurisdiction (1964), 77 Harv L Rev 1037. Israel Convisser, Primary Jurisdiction: The Rule and its Rationalizations (1956), 65 Yale L J 315; 3 Davis, Administrative Law Treatise, ch. 19.

(1952), 342 US 570, 574, 575 (72 S Ct 492, 96 L Ed 576).

In *Ellison* v. *Rayonier Incorporated* (D Wash, 1957), 156 F Supp 214, the plaintiffs (owners of oyster beds) sought to obtain damages for water pollution. The court held that the Washington State Water Pollution Control Commission had primary jurisdiction (p 219):

"Important private and public interests in a wide variety of particulars are in seeming conflict and require consideration of ultimate State public policy in determining the extent and character of water pollution to be permitted in general and specific cases. Such determination involves extremely technical, complicated and scientific problems which reasonably might be thought more suitable for resolution by administrative procedures than by the trial of particular damage claims the varying decisions of which provide no specific standards. Many factors of importance to the industrial development of the State could not or might not be considered in a private damage action based on water pollution."[28]

To rule on the plaintiff's cause of action would require a court to duplicate the efforts of the water resources commission and perhaps to contradict the agreements which, we have observed, function as orders. In order to achieve uniformity and consistency in this vital area, we think it would be wise for the courts to refrain from ruling on the merits of the association's claims at this time.

"The principal reason behind the doctrine of primary jurisdiction is not and never has been the idea

[28] Similarly, see *Schofield* v. *Material Transit, Inc.* (1960), 42 Del Ch 144 (206 A2d 100), where the primary jurisdiction doctrine was held to require "first resort" to the Air Pollution Authority of the State of Delaware; see, also, *Dunlap Lake Property Owners Assoc. Inc.* v. *City of Edwardsville* (1959), 22 Ill App 2d 95 (159 NE2d 4, 6).

that 'administrative expertise' requires a transfer of power from courts to agencies, although the idea of administrative expertise does to some extent contribute to the doctrine. *The principal reason behind the doctrine is recognition of the need for orderly and sensible coordination of the work of agencies and of courts.* Whether the agency happens to be expert or not, a court should not act upon subject matter that is peculiarly within the agency's specialized field without taking into account what the agency has to offer, for otherwise parties who are subject to the agency's continuous regulation may become the victims of uncoordinated and conflicting requirements." 3 Davis, Administrative Law Treatise, § 19.01, p 5. (Emphasis supplied.)

The association may administratively challenge the water resources commission's orders and then, if dissatisfied with the commission's disposition of its claims, it can obtain judicial review through the administrative procedure act. It may then again initiate an action in equity to abate the nuisance if it still feels itself aggrieved and entitled to equitable relief. Since plaintiffs do not seek a money judgment and there does not appear to be a statute of limitations problem, there is no need to keep the present action pending in the interim.[29]

In holding that the association should pursue its administrative remedy before the courts should further entertain an action seeking the formulation of an equitable decree, we have recognized and given consideration to the fact that at the time this action was commenced the commission had not acted, that the agreements between the commission and the defendants city and leather company had not been en-

---

[29] *Cf. Grevers* v. *Michigan Bell Telephone Company* (1969), 18 Mich App 422.

tered into and the fact that it is uncertain[30] whether, had the association then sought relief before the commission, the commission would have entertained a petition which sought the initation of a proceeding by the commission for the elimination of the pollution of White Lake.

In another case it might appear that immediate equitable intervention is necessary,[31] that an administrative proceeding would not give the plaintiff the relief to which he is entitled.[32] Or if the water

---

[30] In this connection we note that the act in terms does not authorize a person injured by pollution to initiate a proceeding before the commission, that the commission alone can initiate formal proceedings (see § 7 discussed in main text at footnote 17). Nevertheless, it appears that the commission does act on citizen complaints. See State administrative code, p 2102 (1954).

We appreciate that the resources of the commission available for investigation are limited, that every complaint filed, formally or informally, cannot be acted upon with the expedition that it probably deserves. We also can understand that some complaints are, in the judgment of the commission's staff not worth pursuing, either intrinsically or, again, having in mind the limited resources of the commission. With that in mind, we suspect that further legislation is probably of less importance than additional appropriations. Nevertheless, it must be observed that if a citizen's complaint is not acted upon expeditiously and he chooses to pursue a judicial remedy, that it might be totally unfair to remit him to an administrative remedy just because the commission then decides either at the instance of the defendant in the lawsuit or on its own motion to initiate a proceeding under § 7 of the act.

In the absence of an administrative remedy, a court could not refuse to exercise jurisdiction. See *Dohany* v. *City of Birmingham, supra; Urie* v. *Franconia Paper Corp.* (1966), 107 NH 131 (218 A2d 360); similarly see *People* v. *City of Los Angeles* (1958), 160 Cal App 2d 494 (325 P2d 639, 645), where the court allowed maintenance of a nuisance action to abate pollution; under the relevant statute there was no way for the plaintiff to initiate proceedings before the administrative board.

In this case the commission entered into the agreements with the city and the leather company after the plaintiffs' complaint had been dismissed. It does not appear, therefore, that the commission's action was taken in order to forestall this litigation.

[31] *Cf. Steele* v. *Clinton Electric Light & Power Co.* (1937), 123 Conn 180 (193 A 613, 616); *Carter* v. *Suburban Water Co.* (1917), 131 Md 91 (101 A 771, 772).

[32] See *Stanton* v. *Trustees of St. Joseph's College* (1967), 233 Me 718 (233 A2d 718, 724).

Indeed, to the extent that allocation of clear water among competing users is an economic problem, the optimal distribution of this resource is discouraged by legal obstacles which distort the bid-

resources commission refuses to act on a plaintiff's petition seeking relief,[33] or if, before the applicability of the primary jurisdiction doctrine is asserted, judicial proceedings have advanced to a point where it would be unfair to remit the plaintiff to another and duplicative proceeding,[34] a court of equity might well conclude that the proper administration of justice requires it to retain jurisdiction and itself to decide the matter. There are no absolutes, each case must be decided on its own facts.[35]

In this case the defendants have not answered; their motions for accelerated judgment were granted. It does not appear that any pretrial preparation has occurred. The plaintiffs will not be re-

---

ding process between recreational and industrial users. We recognize that refusal of a court to entertain a case by invoking the concept of primary jurisdiction may raise the cost to the citizen of challenging water pollution, and that adjustment of competing public and private claims will be delayed or prevented altogether if it becomes significantly less costly for industry to pollute waters than for private citizens to restrain their pollution. For an analysis of this problem of "transaction costs" see Coase, The Problem of Social Cost, 3 Journal of Law and Economics 1 (1960). See, also, Hirshleifer, Water Supply: Economics, Technology & Policy (1960).

[33] See footnote 30.

[34] Cf. Arnold v. Ellis (1966), 5 Mich App 101, 110; see, also, Interstate Milk Handlers v. Hoffman (1955), 34 NJ Super 356 (112 A2d 574, 577).

[35] The standing and primary jurisdiction concepts have this in common: both assume that the plaintiff may have a meritorious claim and yet, for largely institutional reasons, a judge who applies one of these concepts in a particular case refuses to decide the issues on their merits. Since these concepts are largely self-imposed limitations, their application in particular cases should be characterized by great flexibility. They need not be invoked willy-nilly—merely because another judge declined in another seemingly similar case to entertain an action.

Just as a judge may, as a matter of judgment, decide that a particular plaintiff has no standing or that another tribunal should first hear the case, another judge may decide to entertain a case which appears to be similar to the case declined if in the case at hand the plaintiff's interest appears to that judge to be substantial and he concludes, as a matter of judgment, that he ought to exercise the court's power without delay, that alternative nonjudicial remedies are inadequate, e.g., unclear, uncertain, cumbersome or likely to be unduly protracted.

quired to repeat before the administrative agency presentations already made before the circuit court.

While the plaintiffs claim that the pollution of the lake is increasing, it does not appear that this is a case which requires immediate equitable intervention in order to preserve the status quo. Without attempting to minimize the seriousness of the situation as it affects the members of the plaintiff association, the conditions of which they complain have existed for a considerable period of time. Neither defendant began its pollution of White Lake just before this lawsuit was commenced.

It has not been shown that effective relief cannot be obtained in a proceeding before the water resources commission.[36]

Considerable sums may have already been expanded on engineering and other like work in connection with the negotiation and implementation of the agreements between the commission and the defendants. If this lawsuit were allowed to continue, the wisdom of these agreements, their adequacy would, no doubt, be an issue in the lawsuit; the sums of money expended by the defendants in connection therewith would be an equity to be considered in determining the relief, if any, to which the association is entitled.

For even if it were to be determined in this lawsuit that the pollution of White Lake by the defendants is unreasonable, an injunction prohibiting continued pollution of White Lake would not issue as a matter of course. In *Monroe Carp Pond Co.* v. *River Raisin Paper Co.* (1927), 240 Mich 279, it was

---

[36] See *Stanton* v. *Trustees of St. Joseph's College, supra;* Bernard Schwartz, Primary Administrative Jurisdiction and the Exhaustion of Litigants, 41 Georgetown L J 495 (1953); *cf.* Louis B. Schwartz, Legal Restriction of Competition in the Regulated Industries: An Abdication of Judicial Responsibility, 67 Harv L Rev 436, 464, *et seq.* (1954).

found that the use made of the stream by the defendants was not reasonable;[37] nevertheless, an injunction was denied and the relief granted was limited to money damages. The plaintiff in that case was in the business of storing and feeding carp. The defendants were the city of Monroe and its principal industries. The court denied an injunction stating that it was apparent that the granting of an injunction would work (p 289) "a great injury, entirely disproportionate to that sustained by plaintiff, upon the defendants, and it would also seriously affect the prosperity of the city."[38]

We note the comprehensive powers of the water resources commission to regulate and prohibit pollution. The plaintiff association does not seek money damages; it expressly eschews a money recovery. It seeks only equitable relief and it may well obtain from the commission the relief which it seeks in this action and, perhaps, more complete and effective relief.

Affirmed. No costs.

All concurred.

---

[37] See footnote 11.

[38] But see, also, *People, ex rel. Stream Control Commission,* v. *City of Port Huron* (1943), 305 Mich 153, where the Court stated the "doctrine of 'comparative injury' should be confined to those situations where the plaintiff can be substantially compensated."

See, also, *Whalen* v. *Union Bag & Paper Co.* (1913), 208 NY 1 (101 NE 805), holding that an injunction must be granted a lower riparian owner (a farmer) who otherwise would continue to be substantially affected by the defendant's (a pulp mill) pollution of a stream without regard to the comparative injury; and *Pennsylvania R. Co.* v. *Sagamore Coal Co.* (1924), 281 Pa 233 (126 A 386), so holding in a case where the injunction was sought by a public water supply company. The comparative injury doctrine is recognized in *York* v. *Stallings* (1959), 217 Ore 13 (341 P2d 529), and *Gilpin* v. *Jacob Ellis Realties* (1957), 47 NJ Super 26 (135 A2d 204). Contrast *Hark* v. *Mountain Fork Lumber Co.* (1945), 127 W Va 586 (34 SE2d 348).

See, generally, Hines, Nor Any Drop to Drink: Public Regulation of Water Quality, 52 Iowa L Rev 186, 200 (1966).