Edward E. STANTON, Helen S. Stanton, Francis E. Daggett, Margaret E. Daggett, Mildred A. Libby, Fred H. Libby, Jr., *Gerald L. Stanton, Susan Stanton,* Ernestine H. Whitman and Paul Whitman of the Town of Standish

v.

TRUSTEES OF ST. JOSEPH'S COLLEGE, a Corporation with place of business at Standish, Maine, commonly known as Saint Joseph's College.

Supreme Judicial Court of Maine.

Oct. 4, 1967.

Robert L. Cram, Falmouth, for plaintiff.

Mahoney, Desmond, Robinson & Mahoney, by Robert C. Robinson, Portland, for defendant.

Before WILLIAMSON, C. J., and TAPLEY, MARDEN, and WEATHERBEE, JJ.

WEATHERBEE, Justice.

On appeal. The plaintiffs are residents of Standish and riparian owners along a small non-navigable brook known as Wescott Brook which flows through their land and empties into the Presumpscot River. The defendant trustees operate a private college for women in Standish and their

plans for expanding the college's facilities call for a new dormitory requiring a new sewage disposal plant which would emit an estimated 50,000 gallons of liquid residue per day. Although the defendants own no land bordering upon the brook or in its watershed, they have acquired easements from certain riparian owners upstream from the plaintiffs' land authorizing them to pump their sewage through pipes across the servient tenements and thus discharge it into the brook. Defendants applied to the Maine Water Improvement Commission for a license to so discharge this liquid residue into Wescott Brook which was granted after due notice and a public hearing pursuant to the requirements of 38 M.R.S.A. § 414. The plaintiffs, who had opposed the granting of the license, appealed from the decision of the Commission following the appeal procedure provided by statute. However, the plaintiffs subsequently filed a motion for a voluntary dismissal of their appeal, which was granted, and commenced this action in the Cumberland County Superior Court seeking to enjoin the defendants from the discharge of their waste water or effluent into Wescott Brook in spite of the license to do so which the Commission has granted them.

The defendants moved to dismiss the complaint on the grounds that 1) the plaintiffs had failed to exhaust their administrative remedies, and 2) the plaintiffs had failed to show a right to relief upon the facts and law presented. The single justice sitting below found that the statutory provisions for an administrative hearing and appeal had afforded the plaintiffs an adequate remedy at law of which the plaintiffs had not availed themselves and that therefore they were not entitled to equitable relief. The complaint was dismissed and the plaintiffs have appealed the decision to this court.

Although the complaint does not specifically allege Wescott Brook to be a non-navigable stream (and amendment before trial of the principal issue may be appro-

priate) it sufficiently describes it as such for the purposes of our consideration. The effluent which defendants propose to discharge would, if the plaintiffs' contentions are correct, pollute the water of this brook and render it unsuitable for plaintiffs' use and enjoyment. We accept the plaintiffs' allegations of fact to be correct for the purposes of this appeal as the justice below did when he ruled that the plaintiffs' action was barred because of their failure to pursue their administrative remedy. We consider the correctness of his ruling against this background.

The plaintiffs contend that as riparian owners along a non-navigable brook, they have a right to have the stream flow across their property undiminished in either quantity or quality, subject only to a reasonable use by other riparian owners above them, and that defendants are not such riparian owners. This right, they argue, is a private property right.

■ Since the beginning of our statehood our citizens have attached great importance to the use of the waterways and our court has frequently been called upon to examine claimed public and private rights in the waters of the State. The law distinguishes between navigable and non-navigable waters for the purpose of determining what waterways the public has the right to use and what waterways are the private property of the riparian owners. Navigable, or public waters, have been variously defined as those bodies of water which are tidal (Opinion of the Justices, 118 Me. 503, 106 A. 865 (1919); Small v. Wallace, 124 Me. 365, 129 A. 444 (1925)), or lakes or ponds whose surface area is greater than ten acres (Flood v. Earle, 145 Me. 24, 71 A.2d 55 (1950)), or whose waters are suitable for, or capable of, having property transported upon them (Brown v. Chadbourne, 31 Me. 9 (1849); Wadsworth v. Smith, 11 Me. 278 (1834)). When a body of water falls within one of the above categories it is deemed to be a public waterway open to certain public

uses. 56 Am.Jur. Waters Sec. 177ff. (1947); 93 C.J.S. Waters § 15ff. (1956). The rights of a riparian owner in non-navigable streams and brooks are private rights, subject only to the right of reasonable use by other riparian owners. Cent. Me. Power Co. v. Pub. Util. Comm., 156 Me. 295, 163 A.2d 762 (1960); Hamor v. Bar Harbor Water Co., 78 Me. 127, 3 A. 40 (1886); Davis v. Getchell, 50 Me. 602 (1862); Wadsworth v. Smith, supra.

It is well to observe at this point that we are not now called upon to make a determination as to the extent of these plaintiffs' rights and whether the proposed action of defendants would in fact violate these rights. These issues may arise at another time. Here we only seek to determine the principles of law applying generally to riparian owners on non-navigable streams. We find that this court has defined them on several occasions.

"But such little streams or rivers as are not floatable, that is, cannot, in their natural state, be used for the carriage of boats, rafts, or other property, are wholly and absolutely private; not subject to the servitude of the public interest, nor to be regarded as public highways, by water, because they are not susceptible of use, as a common passage for the public." Wadsworth v. Smith, 11 Me. 278, 281 (1834).

"Every proprietor upon a natural stream is entitled to the reasonable use and enjoyment of such stream as it flows through or along his own land, taking into consideration a like reasonable use of such stream by all other proprietors above or below him. The rights of the owners are not absolute but qualified, and each party must exercise his own reasonable use with a just regard to the like reasonable use by all others who may be affected by his acts. Any diversion or obstruction which substantially and materially diminishes the quantity of water, so that it does not flow as it has been accustomed to, *or which defiles and corrupts it so as to essentially impair its purity*, thereby preventing the use of it for any of the reasonable and proper purposes to which it is usually applied, is an infringement of the rights of other owners of land through which the stream flows, and creates a nuisance for which those thereby injured are entitled to a remedy." (Emphasis added) Lockwood Co. v. Lawrence, 77 Me. 297, 316 (1885), and adopted in Kennebunk, Kennebunkport & Wells Water District v. Maine Turnpike Authority, 145 Me. 35, 42, 71 A.2d 520, 526 (1950).

The Justices of our Court in 1919, in answer to a question from the House of Representatives, gave that body their opinion as to rights of the riparian owner in rivers and streams in the following language:

"The legal rights of the riparian proprietor along the rivers and streams flowing from great ponds are equally well settled. Where lands border upon a non-tidal stream, although it may be floatable for logs or boats, each of the riparian proprietors owns the fee in the land which constitutes the bed of the stream to the thread of the stream, 'ad medium filum aquae,' as it was anciently expressed, and if the same person owns on both sides he owns the entire bed, unless, of course, it is excluded by the express terms of the grant itself. * * *

"The riparian proprietor has the right to take fish from the water over his own land, to the exclusion of the public. * * * He does not own the water itself, but he has the right to the natural flow of the stream, and the right to the use and benefit of it, as it passes through his land, for all the domestic and agricultural purposes to which it can be reasonably applied and *no proprietor above or below can unreasonably divert, obstruct or pollute it*. (Emphasis added.) * * *

"All these rights which the riparian proprietor has in the running streams

are as certain, as absolute, and as inviolable as any other species of property, and constitute a part of his land as much as the trees that grow thereon, or the mill or the house that he builds thereon. He can be deprived of them only through the power of eminent domain constitutionally exercised." Opinion of the Justices, supra, 118 Me. at 506–507, 106 A. at 868.

■ We conclude that the riparian owner of a non-navigable stream has an interest in the preservation of the quality of its water which is private property.

The Maine Water Improvement Commission was created in 1941 under the name of the Sanitary Water Board which was given the minimal powers of studying and recommending "ways and means of eliminating from the streams and waters of this state, so far as practicable, all substances and materials which pollute, or tend to pollute, the same, * * *" P.L.1941, Chap. 209, § 1. In 1945, the Legislature added to the Board's powers by requiring the Board's authorization before any new source of pollution could be discharged. A license could be refused when any increased pollution would be "inconsistent with the public interest." P.L.1945, Chap. 345, § 4. When, in 1951, the Legislature changed the Board's name to the Water Improvement Commission, the Commission assumed all of the powers and duties previously exercised by the Board. P.L.1951, Chap. 383. In 1953 the latest significant legislation pertaining to water pollution control was enacted—a statutory classification of the waters of Maine according to the purpose for which such waters are suited, thereby giving meaning to the previously undefined standard "public interest". P.L.1953, § 403 (now 38 M.R.S.A. §§ 363–372). Wescott Brook was included in this classification. For a more extensive analysis of the growth of the Water Improvement Commission see Delogu, Effluent Charges, 19 Me.L.Rev. 29 (1967).

■ As this brief perusal has shown, the concern of the Legislature, and therefore of the Commission, is stated to be the protection of the *public* interest, and the statutes specify no authority or power to act in any manner to take *private* property as by eminent domain, condemnation, etc. The statutes empower the Commission to determine what is or is not in the public interest and to act accordingly. In our interpretation of the Water Improvement statutes we must consider two long established principles of statutory construction. The first is that statutes in derogation of the common law must be strictly construed.

"* * * [T]his court very recently gave effect to the well-established rules of statutory construction that the common law is not to be changed by doubtful implication, be overturned except by clear and unambiguous language, and that a statute in derogation of it will not effect a change thereof beyond that clearly indicated either by express terms or by necessary implication." Chase v. Inhabitants of Town of Litchfield, 134 Me. 122, 129, 182 A. 921, 925 (1936). See also Farmington Dowel Products Co. v. Forster Mfg. Co., 153 Me. 265, 136 A.2d 542 (1957); Wiley v. Sampson-Ripley Co., 151 Me. 400, 120 A.2d 289 (1956).

■ As 38 M.R.S.A., Chap. 3, the chapter creating the Water Improvement Commission and granting it certain powers in the regulation of the disposal of industrial waste and municipal and domestic sewage, is in derogation of the common law this rule of construction must be applied. We do not find that it contains any clear and direct language authorizing the Commission to determine private rights in non-navigable waters.

The second applicable rule of construction states that "if a statute is susceptible of two interpretations, and one of the interpretations will render the statute unconstitutional and the other will not, the latter should be adopted." State v. Intoxicating

Liquors, 80 Me. 57, 62, 12 A. 794, 795 (1888). The Maine Constitution, Article I, Sec. 21, forbids the taking of private property for public uses without just compensation. The Water Improvement statute does not provide for the payment of compensation to persons whose property has been taken for public uses. The statute cannot constitutionally authorize the Commission to permit defendants to pollute the brook which flows through plaintiffs' lands and thus take from plaintiffs their private property without the payment of just compensation.

In 1950 this court was presented with a question of whether a Water District could be empowered by the Legislature to take the water of a brook for a public water supply, a non-riparian use, without the payment of just compensation. The court, adopting in part language from City of Auburn v. Union Water Power Co., 90 Me. 576, 587, 38 A. 561, 566, 38 L.R.A. 188 (1897), discussed the problem in this manner:

" 'The waters of great ponds and lakes are not private property. They are owned by the state; · and the state may dispose of them as it thinks proper.' This doctrine has no application to the waters of brooks and streams, to the use of the waters of which the riparian proprietors upon their banks have certain rights recognized and limited by law. It is true that the waters of such streams may be taken for a public use. This may be done by the State itself, by a public Agency created by the State, or by a private public service corporation duly organized and *upon which such power has been conferred by the State.* Such taking and diminution of the rights of the riparian proprietors, be they either upper or lower proprietors, however, is the *taking of private property for a public use, and this can be accomplished only in the manner prescribed by law and then only when fair compensation is paid* therefor." (Emphasis added) Kennebunk, Kennebunkport & Wells Water District v. Me. Turnpike Author-

ity, 145 Me. 35, 48, 71 A.2d 520, 528 (1950).

We recognize that one's use of one's property may be restricted by the State under its police power (York Harbor Village Corp. v. Libby, 126 Me. 537, 140 A. 382 (1928); State v. Mayo, 106 Me. 62, 75 A. 295 (1909); State v. Robb, 100 Me. 180, 60 A. 874 (1905), but we are not required here to determine the possible authority of the Water Improvement Commission to *restrict* the riparian owner's use of his property when the Commission determines it to result in a pollution of the stream which is against the public interest.

■ The single justice below found that the administrative procedure for hearing and appeal in 38 M.R.S.A. § 414 and § 415 provided the plaintiffs with an adequate remedy at law and that the plaintiffs were thus not entitled to the equitable relief sought. We have often stated this rule to be that " * * * equity will not take jurisdiction where the remedy at law is plain, adequate, and complete." York v. McCausland, 130 Me. 245, 253, 154 A. 780, 783 (1931). Sullivan v. Portland & Kennebec R.R. Co., 94 U.S. 806, 24 L.Ed. 324 (1876); Viles v. Korty, 133 Me. 154, 174 A. 903 (1934); W. R. Lynn Shoe Co. v. Lunn & Sweet Shoe Co., 108 Me. 198, 79 A. 721 (1911). This court has not been called upon before to examine the doctrine of exhaustion of administrative remedies. It bears a relation to and may be included in the doctrine that equitable relief is not available while an adequate remedy at law exists, although not as broad as the latter rule which includes other adequate legal remedies than administrative ones.

We concern ourselves particularly here with the principle of exhaustion of administrative remedies because it is the administrative remedy that the defendant argues and that the single justice found was adequate for the plaintiffs' needs.

■ This principle is generally stated to be that where the law provides a remedy before an administrative agency, the plain-

tiff must exhaust that remedy before he can turn to the courts for relief.

> "The doctrine of exhaustion of administrative remedies requires that where a remedy before an administrative agency is provided, relief must be sought by exhausting this remedy before the courts will act. This doctrine is well established, is a cardinal principle of practically universal application, and must be borne in mind by the courts in construing a statute providing for review of administrative action." 2 Am.Jur.2d Administrative Law § 595 (1962).

When, as here, it is not imposed by statute, it is a limitation which the courts impose upon themselves. It is based upon a policy of avoiding interference with the functions of an agency created by the Legislature and a recognition of the advantages of leaving some preliminary determination to agencies which are particularly competent to dispose of them.

There is no uniformity among the jurisdictions as to application of the rule, some courts holding the waiver of the doctrine by a court to be a matter of judicial discretion except in cases where the statute itself makes the exhaustion of administrative remedies a prerequisite to suit (Adler v. United States, 146 F.Supp. 956, 134 Ct. Cl. 200 (1956); Cuiffo v. United States, 137 F.Supp. 944, 131 Ct.Cl. 60 (1955); Durgin v. Brown, 37 N.J. 189, 180 A.2d 136 (1962)), and others that there is no jurisdiction in the court until the administrative procedure has been completed. Dixie Downs, Inc. v. Ark. Racing Comm., 219 Ark. 356, 242 S.W.2d 132 (1951); Alexander v. State Personnel Board, 22 Cal.2d 198, 137 P.2d 433 (1943); Goodwin v. City of Louisville, 309 Ky. 11, 215 S.W.2d 557 (1948); Sanders v. Okl. Employment Security Comm., 200 Okl. 366, 195 P.2d 272 (1948). Many courts hold that even such a fundamental question as jurisdiction must first be determined by the administrative agency and the appeal procedure applied by the statute. 2 Am.Jur.2d Administrative Law § 604 (1962). On the other hand, the New Jersey courts, as explained by Chief Justice Vanderbilt in Nolan v. Fitzpatrick, 9 N.J. 477, 89 A.2d 13 (1952), although recognizing the principle, refuse to accept a hard and fast rule, believing that "[J]udges are scarcely so insensible to the subtle intricacies of delaying the proceedings and bad faith harassments as to be unable to 'sift the wheat from the chaff' when applications for a declaratory order or an injunction are filed in advance of a final administrative order." New Jersey courts have recognized three exceptions to the application of the doctrine—1) where jurisdiction of the agency is questioned on persuasive grounds, 2) where the agency had jurisdiction but the charges asserted before it were so palpably defective that its jurisdiction was merely colorable, and 3) where the question presented is solely one of law. The opinion said further:

> "In every case the court should determine whether it is in the interest of justice to dispense with the requirement that the plaintiff exhaust other judicial or administrative remedies, bearing in mind, however, that Rule 3:81–14 itself dictates that the interest of justice is ordinarily best served by requiring the plaintiff to first exhaust his other remedies and that it is only in special circumstances that the interest of justice will require otherwise. * * *" Nolan v. Fitzpatrick, supra, 89 A.2d at 17.

We accept the doctrine of exhaustion of administrative remedies as a general principle. We recognize, however, that special circumstances may require a relaxation of the rule. Such circumstances occur when the plaintiffs' complaint alleges persuasive grounds for relief which are beyond the jurisdiction of the administrative agency to determine, and when it would thus be futile for the plaintiffs to complete the administrative appeal process. The plaintiffs allege such grounds here.

The Water Improvement Commission was empowered only to determine whether the discharge of the defendants' sewage effluent into the brook would be against the

public interest. The plaintiffs, as members of the public, were entitled to appear and oppose this, as they did. We realize that if they had pursued their appeal to its ultimate conclusion, an appeal tribunal ·or court might have decided that the defendants' discharge of sewage into Wescott Brook was *not* at that time in the public interest and so denied the license to defendants. While this would relieve plaintiffs' problems, it would be only an incidental and perhaps a temporary relief as the same tribunal might later decide upon a new application that the situation had so changed that the public interest required that the license be granted. Such a remedy would not be adequate. The plaintiffs are entitled to have their alleged private rights in these waters finally determined as against the defendants' proposed use and to have these private rights protected against irreparable harm by injunctive process if their contentions are successfully established. Only the remedy which they presently seek can accomplish these results.

▪ The defendants also urge that the plaintiffs, having filed their appeal (later withdrawn) from the decision of the Water Improvement Commission, had thus made an election of remedies which barred them from ever pursuing their present course of action. This court has considered the doctrine of election of remedies in other cases. Danby v. Hanscom, 156 Me. 189, 163 A.2d 372 (1960); Hussey v. Bryant, 95 Me. 49, 49 A. 56 (1901). In Carey v. Cyr and Denico, 150 Me. 405, 407, 113 A.2d 614, 616 (1955), we accepted as a correct statement of the rule the language of the Missouri court, which we quoted:

"The basis of the rule sought to be invoked is that one may not have the aid of the courts upon two contradictory principles or theories based upon one and the same set of facts. * * * 'The basic concept of the doctrine of election is that a party shall not be permitted to insist at different times upon the truth of two inconsistent and repugnant positions, according to the promptings of his own interest, as to first affirm and later disaffirm a contract, or the like.' Myers v. Ross, D.C., 10 F.Supp. 409, 411." See also 25 Am.Jur.2d Election of Remedies §§ 9, 10, 11 and 12 (1966); 28 C.J.S. Election of Remedies §§ 9 and 10 (1941).

In Appealing from the Commission's decision which was in essence that it was not against the *public* interest that the defendants' proposed discharge of effluent be permitted, the position of the plaintiffs was in no way contradictory of or inconsistent with their present contention that such a discharge would violate their *private* rights.

▪ A further and compelling reason for sustaining the plaintiffs' appeal is found in the provisions of 38 M.R.S.A. § 372. This section refers to the issuance of a license to discharge sewage such as was granted to the defendant and which was the underlying basis for single justice's granting the motion to dismiss. Its concluding lines read "nor shall any license granted under this subchapter constitute a defense to any action at law for damages."

▪ We are satisfied that the "action at law" for damages which the statute specifically preserves necessarily includes a civil action for injunctive relief against a threatened irreparable injury. If the plaintiffs are entitled to bring an action at law for damages in spite of the granting of a license, long established principles entitle them to relief of an equitable nature if damages would be inadequate. Whitehouse, Equity § 99; Prosser on Torts, Chap. 14, § 73; Lockwood v. Lawrence, supra, 77 Me., p. 311.

The entry will be:

Appeal sustained.

WEBBER and DUFRESNE, JJ., did not sit.