Philip J. **VALENTE**

v.

**BOARD OF ENVIRONMENTAL PROTECTION.**

Supreme Judicial Court of Maine.

Argued Nov. 8, 1982.

Reargued May 9, 1983.

Decided June 14, 1983.

---

Jensen Baird Gardner & Henry, Kenneth M. Cole, III (orally), Michael A. Nelson, Portland, for plaintiff.

Gregory W. Sample, Asst. Atty. Gen. (orally), Augusta, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

VIOLETTE, Justice.

Philip J. Valente appeals from a Superior Court, Cumberland County, affirmation of a decision by the Maine Board of Environmental Protection ("Board") denying his application for a permit under the Site Location of Development Law ("Site Law"), 38 M.R.S.A. §§ 481–490 (1978 & Supp.1982), to remove topsoil from 40 acres of land in Poland. Because we find that the Board overstepped its statutory authority, we sustain Valente's appeal.

Valente is the owner of a 66 acre plot of land in Poland. He applied to the Board for permission to strip 12 inches of topsoil from 40 acres of that plot, one acre at a time,[1] and then to reclaim the land by planting it with grass. The Board identified the entire 40-acre parcel as "prime cropland" because of the high quality of its topsoil, and found that the parcel had "a long history of successful agricultural use." The Board also found that Valente's land had good drainage, resulting in a relatively long frost-free growing season, but that removal of the topsoil would significantly reduce the land's water holding capacity and rooting depth. Finally, the Board found that there were only 142 acres of cropland (in parcels of 10 acres or more) in recent production in the town of Poland,

including the 40 acres Valente proposed to strip for topsoil.

The Board denied Valente a permit solely on the basis that

The stripping of 12 to 18 inches of loam from the site will drastically reduce the ability of the property to grow food stuffs, thus substantially reduce [sic] the base of farmland available for commercial agriculture in a rural area. The loam removal will adversely affect existing and potential agricultural uses of the site in the local farming community, and will eliminate substantial natural farmland resources important to the municipality and neighboring municipalities.

The Board also found that Valente had satisfied every other criterion of the Site Law.[2] The only question before us is whether the Board has statutory authority to deny a development permit under the Site Law solely because the planned development would remove from existing use 40 acres of prime cropland and thereby eliminate a natural agricultural resource important to the Town of Poland and surrounding municipalities.

"Legislative intent is the fundamental rule in the construction or interpretation of statutes . . . Such a construction ought to be put upon a statute as may best answer the intent which the Legislators had in view, and when determinable and ascertained, the courts must give effect to it." In Re Spring Valley Development, 300 A.2d 736, 741 (Me.1973) (quoting King Resources Co. v. Environmental Improvement Commission, 270 A.2d 863, 869 (Me.1970)); W.S.

---

1. 38 M.R.S.A. § 483(2) requires Board approval of any "development"; § 482(2) "development" includes any excavation of natural resources "where the area affected is in excess of 60,000 square feet."

2. The Board found, pursuant to 38 M.R.S.A. § 484, that:
   1. The applicant has provided adequate evidence of financial capacity and technical ability to meet air and water pollution control standards.
   2. The applicant has made adequate provision for solid waste disposal, the control of

offensive odors, and the maintenance of sufficient and healthful water supplies.
   3. The applicant has made adequate provision for traffic movement of all types out of or into the development area.
   4. The proposed development will involve soil types which are suitable to the nature of the undertaking.
   5. The applicant has made adequate provision for fitting the project harmoniously into the existing natural environment beyond the site boundaries and the development will not adversely affect the scenic character of the area.

*Libbey Co. v. Johnson,* 148 Me. 410, 414, 94 A.2d 907, 909 (1953).

■ Administrative agencies are creatures of statute, and can only have such powers as those expressly conferred upon them by the Legislature, or such as arise therefrom by necessary implication to allow carrying out the powers accorded to them. *Clark v. State Employees Appeals Board,* 363 A.2d 735, 737 (Me.1976). The Site Law is an exercise of the police power of the State and stands in derogation of the common law. Well established rules of statutory construction state that "the common law is not to be changed by doubtful implication, be overturned except by clear and unambiguous language, and that a statute in derogation of it will not effect a change thereof beyond that clearly indicated either by express terms or by necessary implication." *Stanton v. Trustees of St. Joseph's College,* 233 A.2d 718, 722 (Me.1967) (citation omitted).

In deciding whether the Board acted within its statutory powers in denying Valente a permit on the basis of his failure to comply with section 484(3), we must begin by examining the pertinent provisions of the Site Law.

Section 481 sets out the purpose of that law.

The Legislature finds that the economic and social well-being of the citizens of the State of Maine depend upon the location of state, municipal, quasi-municipal, educational, charitable, commercial and industrial developments with respect to the natural environment of the State; that many developments because of their size and nature are capable of causing irreparable damage to the people and the environment in their surroundings; that the location of such developments is too important to be left only to the determination of the owners of such developments; and that discretion must be vested in state authority to regulate the location of developments which may substantially affect environment.

. . . .

The purpose of this subchapter is to provide a flexible and practical means by which the State, acting through the Board of Environmental Protection, in consultation with appropriate state agencies, may exercise the police power of the State *to control the location of those developments substantially affecting local environment in order to insure that such developments will be located in a manner which will have a minimal adverse impact on the natural environment of their surroundings* and protect the health, safety and general welfare of the people. (Emphasis added).

Section 482 then defines the meaning of "natural environment" set forth in section 481. It states:

"Natural environment of a locality" includes the characteristics, quality and uses of the land, air and waters *in the area likely to be affected by such development,* and the degree to which such land, air and waters are free from non-naturally occurring contamination. (Emphasis added)

Surrounding is defined as " . . . the things, conditions, influences, etc. that surround a given place or person; environment." Webster's New World Dictionary, 1434 (2d college ed. 1980). "Their surroundings" in section 481 has to mean the surroundings of the development location (site); it has no other rational meaning. Hence the legislative concern in section 481 is the natural environment of the locality surrounding the development site.

■ It seems emminently clear that the intent and entire thrust of the Site Law is not primarily directed at the development site itself but rather at the effects the development of that site will have upon the natural environment of the locality surrounding the site. "The Site Location Law . . . is not concerned with where a development takes place in general but only that the development takes place in a manner consistent with the needs of the public for a

healthy environment." *In Re Spring Valley Development,* 300 A.2d at 753. The Statement of Fact in L.D. 1834 (104th Legis. 1969), the bill enacted by the Legislature as the Site Law, stated that the purpose of the act was to enable the state to guide and control the location of commercial and industrial developments substantially affecting local environment.

It is within this statutory framework that we must analyze the meaning of section 484, which establishes the criteria the Board must apply in deciding whether to grant or deny a development permit. This section, in relevant part, reads as follows:

The board shall approve a development proposal whenever it finds that:

1. Financial capacity. The developer has the financial capacity and technical ability to meet state air and water pollution control standards, and has made adequate provision for solid waste disposal, the control of offensive odors, and the securing and maintenance of sufficient and healthful water supplies;

2. Traffic movement. The developer has made adequate provision for traffic movement of all types out of or into the development area;

3. No adverse effect on the natural environment. The developer has made adequate provision for fitting the development harmoniously into the existing natural environment and that the development will not adversely affect existing uses, scenic character, or natural resources in the municipality or in neighboring municipalities.

4. Soil types. The proposed development will be built on soil types which are suitable to the nature of the undertaking.

38 M.R.S.A. § 484.

The basis of the Board's decision is that appellant failed to comply with the third criterion of section 484—no adverse effect on the natural environment. The Board determined that the proposed development would have an adverse affect on the environment because it adversely affected both existing uses (potential use of the site for agriculture) and a natural resource (elimination of the site as cropland) important to the town of Poland and neighboring municipalities.

The adverse effects the Board considered, however, were clearly not the type of adverse effects on the local environment that the Site Law provides for or that the Legislature intended the Board to consider. The Site Law is a controlled development law—it is *not* a farmland preservation law. The vast majority of developments approved under the Site Law, for example, have resulted in the conversion of large tracts of raw land, often cropland or forestland, into sites for industrial complexes such as pulp and paper mills, subdivisions for housing developments, and shopping malls with their great sprawl of buildings and even greater sprawl of parking lots. In each case, the site has been a natural resource whose existing use, quality and future value as such have been permanently lost. In each case, however, the developer was able to demonstrate to the Board's satisfaction that the development would have no more than a minimal adverse impact on the natural environment surrounding the site. *See* 38 M.R.S.A. § 481.

In this case, the Board essentially concluded that a "drastic" reduction in the crop-growing capacity of the applicant's own land, even in the absence of any finding of adverse environmental impact on the surrounding area, per se constituted grounds for denial of a project application. When read within the clear meaning of the purpose and intent of the Site Law as set forth in section 481, however, the meaning of the term "adverse effect on the natural environment" captioning subsection 484(3) can only mean the natural environment surrounding the development site. Likewise, the terms "existing uses" and "natural resources" contained in subsection 484(3) cannot, under any reasonable interpretation consistent with the Site Law, refer to the development site itself; the terms can only refer to the existing uses or natural resources of the natural environment in the

municipality or in neighboring municipalities surrounding the development site. 38 M.R.S.A. § 482(3) ("The natural environment of a locality"). Such is the clear import of the Site Law.

To accept the Board's interpretation of the meaning of section 484(3) would in effect introduce a totally new and different criterion to the Site Law, that of farmland preservation and conservation. Nowhere in the legislative debates during consideration and leading to the enactment of the Site Law can there be gleaned any intimation that such a criterion was ever considered, much less intended, by the Legislature. That a state can, in the exercise of its police power, and upon a proper declaration of legislative findings and purpose, enact legislation for the preservation of agricultural cropland to assure the continued availability of land for the production of food and fiber is of no assistance to the Board. No such declaration of policy and purpose has been made by the Maine Legislature.[3]

■ We accordingly hold that the Board erroneously construed the Site Law when it denied Valente the permit he applied for. Exclusive of its error, the Board decided that Valente had complied with every criterion set forth in section 484 of the Site Law. Upon such findings, the Board is required to approve the development proposal and grant the permit. 38 M.R.S.A. § 484.

We therefore reverse the judgment of the Superior Court affirming the decision of the Board, and remand the case to the Superior Court with instructions to remand to the Board for the purpose of granting Valente his permit.

The entry is:

Appeal sustained.

Judgment of the Superior Court reversed.

Remanded to the Superior Court with orders to remand to the Board of Environmental Protection for further proceedings consistent with the opinion herein.

ROBERTS, CARTER and WATHEN, JJ., concurring.

McKUSICK, Chief Justice, and GODFREY and NICHOLS, Justices, dissenting.

We would affirm the judgment of the Superior Court, which upheld the Board of Environmental Protection's denial of Valente's topsoil mining permit.

Section 484 of the Site Location Law states that the Board

shall approve a development proposal whenever it finds that:

. . . .

3. ... The development will not adversely affect existing uses, scenic character, or natural resources in the municipality or in neighboring municipalities.

Each of the specific criteria listed in section 484 is "mandatory"; to obtain a site permit, a developer must meet them all. *In re International Paper Co., Androscoggin Mill Expansion,* 363 A.2d 235, 240 (Me.1976). Failure by an applicant to "affirmatively demonstrate compliance ... as to *any one* of them constitutes a basis for denial of the application." *In re Maine Clean Fuels, Inc.,* 310 A.2d 736, 741 (Me.1973) (emphasis in original).

The Board in this case identified the entire 40-acre parcel that Valente wished to strip-mine as "prime cropland" because of the high quality of its topsoil, and found that the parcel had "a long history of successful agricultural use." The Board also found that Valente's land had good drainage, resulting in a relatively long frost-free growing season, but that removal of the topsoil would significantly reduce the land's

---

**3.** Several states have enacted legislation specifically aimed at the preservation of farmlands and open lands. *See e.g.,* Cal.Gov't Code §§ 6556, 51200, *et seq.* (West Supp.19——); Or.Rev.Stat. § 215.243 (19——); *see generally* Myers, *The Legal Aspects of Agricultural Dis-* tricting, 55 Ind.L.J. 1 (1979); Nielsen, *Preservation of Maryland Farmland: A Current Assessment,* 8 U.Balt.L.Rev. 429 (1979); Note, *Farmland Preservation Techniques: Some Food for Thought,* 40 U.P.H.L.Rev. 258 (1979).

water holding capacity and rooting depth.[1] Finally, the Board found that there were only 142 acres of cropland (in parcels of 10 acres or more) in recent production in the town of Poland, including the 40 acres Valente proposed to mine for topsoil. Based on those findings, the Board determined that:

> The stripping of 12 to 18 inches of loam from the site will drastically reduce the ability of the property to grow food stuffs, thus substantially reduce [sic] the base of farmland available for commercial agriculture in a rural area. The loam removal will adversely affect existing and potential agricultural uses of the site in the local farming community, and will eliminate substantial natural farmland resources important to the municipality and neighboring municipalities.

By finding that Valente's proposed mining of topsoil would "adversely affect existing ... agricultural uses ... and [would] eliminate substantial natural farmland resources," the Board held by clear implication that, within the meaning of section 484(3), farming is an "existing use" of the site and topsoil or prime cropland is a "natural resource." We agree with the Board's interpretation of the terms used in section 484(3).

Nothing in the language of the Site Location Law suggests that agriculture does not warrant Board protection as an "existing use" or that topsoil is not statutorily protected as a "natural resource." Without any contrary indication appearing on the face of the law or in its legislative history, a court must give the words used in a statute their ordinary and plain meaning. *See Franklin Property Trust v. Foresite, Inc.,* 438 A.2d 218, 222 (Me.1981). A natural resource such as the topsoil on the limited prime cropland in the town of Poland and

its existing use for farming are in terms mandated for protection by the unambiguous language of section 484(3) of the Site Location Law. In view of the findings of fact made by the Board, setting forth the drastic adverse consequences that would result from the proposed topsoil stripping, the Board acted well within its statutory authority in holding that the project did not qualify for a development permit.

By a process of statutory construction, the court's opinion (p. 719) reads the protections of section 484(3) to apply only to "existing uses" and "natural resources" in an area *outside* the development site itself. That holding considerably limits the effectiveness of the environmental protection laws. Strangely enough, it means that the larger the area that a proposed development encompasses, the more likely is its approval. Also, it means that a rare resource located only within the confines of a proposed development site could be completely destroyed or removed without any regulatory scrutiny by the Board of Environmental Protection. We do not find that statutory construction either reasonable or necessary.

Valente has argued that the Board's interpretation and application of section 484(3)'s language in this case would lead to unreasonable results never intended by the legislature. We see no such danger. Contrary to the premise underlying Valente's argument, court approval of the Board's decision in this case will not give the Board the green light to turn down any future development proposal that has only the incidental and minimal effect of taking some cropland out of production. The Site Location Law does not authorize the Board to deny a permit whenever a proposed development will have any "adverse effect" upon the natural environment; rather, the Board

---

1. The Board's finding of fact as to the effect of the topsoil mining on the 40-acre lot is as follows:

   > A very firm hardpan is present throughout the site at a depth ranging from 18 to 36 inches from the surface. Removal of 12 to 18 inches of the fine sandy loam leaves a thin veneer of original soil over the hardpan. The seasonal water table which is perched over the hardpan will be significantly closer to the soil surface. The soil's available water holding capacity and rooting depth will be significantly reduced.

has been vested with the "discretion" to "insure that such developments will be located in a manner which will have a *minimal* adverse impact on the natural environment of their surroundings." 38 M.R.S.A. § 481 (emphasis added). *See also Brennan v. Saco Construction, Inc.,* 381 A.2d 656, 661–62 (Me.1978); *In re International Paper Co., Androscoggin Mill Expansion,* 363 A.2d at 240. Furthermore, section 484(3) specifically directs the Board to limit its concern to a proposal's adverse effect on existing uses or natural resources "in the municipality or in neighboring municipalities." In the light of that statutory language. The Board acted properly in turning down a topsoil excavation project that would render over 28 percent of the town of Poland's prime cropland nearly useless for agriculture for an indefinite period of time; on the other hand, the Board is not empowered to protect prime cropland from any and all developments that might have an insignificant, minimal, or remote adverse effect upon the topsoil natural resource or upon the existing agricultural use of land in the affected municipalities.

Nothing in the Board's own regulations prohibit it from denying the topsoil mining application on the ground that it adversely affects the existing agricultural use and the natural resource of prime cropland. In 1979, pursuant to 38 M.R.S.A. § 343(1),[2] the Board promulgated regulations designed to "explain and clarify" the meaning of section 484(3). Me.Dept. of Env.Protection Regs., ch. 375 (Nov. 1, 1979). The regulations list fifteen "specific areas of concern" that the Board will consider when it determines whether an applicant has met the requirements of section 484(3), detailing the

Board's policy and procedure as to each area. Farmland conservation is not mentioned as an area of concern for the Board,[3] although an early draft of the regulations included several paragraphs indicating that the Board recognized "the increasing importance of protecting prime agricultural lands." Valente contends that the Board, because it considered the inclusion of farmland conservation among its listed concerns under section 484(3) but then promulgated regulations that are silent on the issue, is now foreclosed from denying a permit application on farmland conservation grounds. We are not impressed with that argument. To foreclose the Board in such a manner by the alleged negative implication flowing from an omission from its regulations is inconsistent with the Board's continuous duty in adjudicatory proceedings to enforce the statutory criteria protecting existing uses and natural resources in the municipalities involved.

It is true, of course, that an agency is ordinarily bound by its own "legislative" rules and regulations.[4] *See* 2 K. Davis, *Administrative Law Treatise* § 7:21, at 98–99 (2d ed. 1979). In this case, however, the Board did not violate the regulations it promulgated in 1979 when it denied Valente's topsoil mining application on farmland conservation grounds. Those regulations by their terms were not exhaustive or exclusive. The Board's own accompanying note stated plainly that the regulations were intended only to cover "several specific areas of concern" that "the Board has identified." That language was enough to put permit applicants on notice that the Board considered itself free, in ruling on

---

**2.** 38 M.R.S.A. § 343(1) (1978) states:

The Board of Environmental Protection may, after public hearing, adopt ... reasonable rules and regulations necessary for the proper ... interpretation of any provision of law that the department [of environmental protection] is charged with the duty of administering. Rules duly promulgated shall have the full force and effect of law.

**3.** The regulations did detail the Board's concern for erosion of topsoil, stating that the Board

"considers topsoil to be a natural resource which should be properly managed." The proposed topsoil mining presents a different question, however, as it would eliminate, rather than erode, the topsoil of the applicant's 40-acre lot.

**4.** "A legislative rule is the product of an exercise of delegated power to make law through rules." 2 K. Davis, *Administrative Law Treatise* § 7:8, at 36 (2d ed. 1979).

future permit applications, to take cognizance of factors not yet administratively identified as legitimate criteria under section 484(3). Like its predecessor, the Environmental Improvement Commission, the Board of Environmental Protection is ordinarily free to apply the Site Location Law "on a case-by-case basis ... under the guidance of the explicit criteria of the statute." *In re Spring Valley Development*, 300 A.2d 736, 754 (Me.1973). While a valid regulation promulgated in a quasi-legislative proceeding may not be violated or ignored in an adjudicatory context, the Board's authority to make adjudicatory decisions "under the guidance of the explicit criteria of the statute" is not limited by the existence of nonexhaustive regulations such as those at issue here.

The fact that the Board apparently made a conscious decision not to include "protecting prime agricultural lands" among its listed "areas of concern" would not alter our analysis. Administrative silence, like legislative silence, means different things in different contexts; an administrative agency may have many reasons for deciding not to promulgate regulations on a particular statutory subject.[5] "Whether the expression of one thing is to operate as the exclusion of another, is ordinarily a question of intention, to be gathered from an examination of all parts of a statute by the aid of the usual rules of interpretation." *City of Portland v. New England Telephone and Telegraph Co.*, 103 Me. 240, 249, 68 A. 1040, 1043 (1907). Examination of all parts of the Board's 1979 regulations convinces us that those regulations were not intended to exclude from Board consideration under section 484(3) factors other than those listed in the regulations themselves. Consequently, the Board was free to take into account, when considering a development permit application, any factors that come within the scope of the statute.

We conclude that the adverse effects of a development upon the existing agricultural use of a site and upon the total amount of prime cropland and topsoil resources "in the municipality" come within the scope of 38 M.R.S.A. § 484(3). It is, therefore, our view that the Board did not abuse its discretion in denying Valente's topsoil mining application.

---

5. *See, e.g.,* Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 Harv.L.Rev. 921, 927–28 (1965) ("the accumulation of experience in individual cases is [often] a necessary prelude to any effort to elaborate statutory standards in a manner that deals realistically with actual problems rather than with hypothetical cases that may never arise").