PA - William Smith          DA - Northland - Richard Langley,
                                                    Bernard O'Mara
                                  DA - Maine, Dept. of Agr. - Mark Randlett
                                                                    AAG

·STATE OF MAINE                          SUPERIOR COURT
AROOSTOOK, ss.                           CIVIL ACTION DOCKET NO.
                                         AP-01-005

DONALD L. GARBRECH?
LAW LIBRARY

REYNOLD SOUCY, et al.,          )
          Plaintiffs            )
                               )
                               )
v.                             )          __DECISION AND ORDER__      **IAPR 3 2002**
                               )
NORTHLAND FROZEN FOODS, )
INC.,                          )
          Defendants           )

The matter is before the court on the plaintiffs' 80C appeal, in which they ask the court to vacate a decision of the Department of Agriculture, Food and Rural Resources (the "Department"), arguing that the Department lacked jurisdiction to issue the decision. For the following reasons, the court vacates the Department's decision.

## BACKGROUND

The plaintiffs, Reynold Soucy ("Soucy") and Donald Dubois ("Dubois"), are potato farmers in Fort Kent who entered into contracts with the defendant, Northland Frozen Foods, Inc. ("Northland"), for the sale of potatoes grown in the 1997 crop year. Soucy's contract provided for delivery of 28,400 cwt. of red potatoes, and Dubois's contract provided for delivery of 17,000 cwt. of red potatoes. The contracts further specified that Northland would determine the delivery schedule, and that Northland had the right to reject any potatoes it deemed not suitable for processing.

In March 1998, Northland refused to accept delivery of potatoes from Soucy and Dubois alleging they did not meet contract standards; Northland states that Soucy and Dubois "struggled to make sixty-five percent (65%) U.S. #1, let alone the eighty-five percent (85%) the contract required them to make." Northland suggested to Soucy and Dubois that they contact another company, Maine Packers, to dispose of the potatoes. Northland subsequently requested and accepted delivery from Soucy twelve loads between April 13, 1998 and May 1, 1998.

Both Soucy and Dubois claim they have incurred substantial losses as a result of Northland's refusal to schedule delivery of potatoes. On June 16, 1999, Soucy brought a complaint against Northland to the Department alleging that Northland:

> accepted 36% of the original contract for red potatoes for the 1997-1998 contract season.

They diverted the rest of the contract crop to Maine Packer, Inc., at a financial loss . . . .
[Soucy] ha[s] not been reimbursed for the loss.

Dubois also filed a claim on June 16, 1999 against Northland with similar allegations:

Whereas Northland Frozen Foods, Inc. accepted 64% of original contract of red potatoes for the 1997-1998 contract season.
They were not willing to take anymore of my contract. I had to disregard the remainder of my contracted crop.
I have not been reimbursed for this loss.

On July 8, 1999, Richard Langley ("Langley"), Northland's attorney, wrote to David Gagnon ("Gagnon"), Director of the Division of Quality Assurance for the Department, asking for information regarding the complaints. On July 20, 1999, Gagnon wrote to Soucy and Dubois and requested information regarding the contracts, deliveries, damages, and efforts to deliver. Soucy responded with the information requested and added:

Please be informed that daily contact was made to Mr. Steve Perrault, Northland's receiving agent, either by telephone or personal contact requesting delivery dates. After explaining to Mr. Perrault that we just had to [sic] many potatoes on hand for that time of year, only to be assured not to panic, Northland would take them all. ... I truly believe a very strong effort was made to deliver the potatoes. Furthermore, we never refused or cancelled any appointments given to us.

Dubois also responded with the information requested, and stated:

I contacted Steve Perreault[,] Northland's receiving agent[,] everyday[,] sometimes even twice a day. On certain days they were running another variety other than reds. He would tell me as soon as they would go back to reds he would schedule several loads for me to haul in. This did not always happen. He told me not to worry, all my potatoes would be taken in.
The last load I hauled in was on June 4th. They nolonger [sic] needed anymore of my potatoes. At this time of year, being so late in the season, I had nowheres [sic] else to go with them. I then proceeded to haul them into the field.
I feel I made every effort possible to haul my potatoes into them[.] I never refused or canceled any appointments. I delivered my potatoes at all times of the day, early mornings, evenings, in the middle of the night and weekends. Anytime they wanted them.

Approximately three weeks later, Langley sent a letter to Gagnon, in which he stated he had "some serious reservations about whether the pending verified complaints involving Northland . . . are being addressed in the proper forum."

2

·Subsequently, on March 22, 2000, Northland filed a motion to dismiss, which asserted, *inter alia*, that "the resolution of the [Soucy and Dubois] complaints is beyond the authority of the Department," and that the complaints had to "be dismissed for failure to come within the provisions of 7 M.R.S.A. §§ 1016, 1017, and 1025." In response, Soucy and Dubois, unrepresented, stated:

> I believe that the intent of the legislature was clear through the Department of Agriculture to intercede as guardian of common law pertaining to any and all violations of contract.
> I believe it is the responsibility of the Department to hold hearing and testimony, establish the truth, render the damages, as proven to be. Also, the hearing officer should, after hearing the evidence institute punitive damages if so deemed.
> The State of Maine Law was enacted for the sole purpose to mediate between contractual parties. ***
> Furthermore, I believe that [the] Legislature has empowered the Department to proceed as scheduled.

In a decision dated August 18, 2000, Gagnon denied the motion to dismiss:

> 7 M.R.S.A. Chapter 103, Article 3, and the Department's rules Chapter 123, provide mechanisms designed to protect potato producers from insufficient or nonpayment for potatoes sold to processor or dealers. The Department is authorized to investigate and hold hearing to determine the validity of the producers' claims. The Department is also authorized to hold and, in appropriate cases, liquidate, bonds posted by processors and dealers in order to secure their obligations to make payment to producers for potatoes sold. ***
> In this case the complainants have filed verified complaints alleging insufficient or nonpayment for potatoes sold to the respondent. The allegations contained within the complaints are sufficient under the statute to warrant a hearing in this matter. In the event the Department should determine, based upon the evidence presented at hearing, that any of the claims, or portions of them, are beyond the authority of the Department to grant relief, then the Department will respond accordingly.
> *** The issue, in the context of this matter, is whether there was a breach of the respondent's obligation to make payment for potatoes sold to it as to justify the Department's liquidation of the bond that it holds for the purpose of securing such payment.

Gagnon conducted hearings on the Soucy and Dubois complaints on October 18, 2000, during which Soucy and Dubois were pro se. Gagnon issued his decision on June 19, 2001, in which he found that the notice and purpose of the proceeding was to implement 7 M.R.S.A. §§ 1015, 1017, and 1025 and the Department's rules, which provide a mechanism designed to protect farmers from nonpayment for potatoes sold

by them to dealers or processors. Gagnon found that "Northland's refusal to accept delivery of potatoes from Soucy and Dubois was not a breach of contract, but rather was based on Soucy's and Dubois'[s] failure to meet quality specifications that were satisfactory to Northland or its customers." He held that Northland's actions did not constitute a violation of its duties under 7 M.R.S.A. § 1017 for which the Department would take action to recover proceeds of Northland's bond under 7 M.R.S.A. § 1025.

Soucy and Dubois filed their appeal to this court on July 30, 2001. They argue that "the Department exceeded its statutory authority under 7 M.R.S.A. [§§] 1017 and 1025 by determining Petitioners' claims for damages resulting from Northland's refusal to accept delivery of potatoes."

## DISCUSSION

"[A]ny person who is aggrieved by final agency action shall be entitled to judicial review thereof in the Superior Court . . . ." 5 M.R.S.A. § 11001 (1) (2002). In reviewing the matter, "[t]he court may:

A. Affirm the decision of the agency;
B. Remand the case for further proceedings . . .; or
C. Reverse or modify the decision if the administrative findings, inferences, conclusions or decisions are . . . . (2) [I]n excess of the statutory authority of the agency."

5 M.R.S.A. § 11007 (4) (2002). "Judicial review shall be confined to the record upon which the agency decision was based . . . ." 5 M.R.S.A. § 11006 (1) (2002); M.R. Civ. P. 80C (d).

### A. Failure to Raise the "Lack of Authority" Argument Before the Department

Northland argues that Soucy and Dubois should have raised the issue of lack of statutory authority at the administrative level, and that their actions below constituted a waiver of the Department's lack of jurisdiction. In support thereof, the respondents cite New England Whitewater Ctr. v. Dep't of Inland Fisheries and Wildlife, et al., 550 A.2d 56 (Me. 1988), in which the Law Court held that "[g]enerally, plaintiffs in a Rule 80C proceeding for review of final agency action are expected to raise any objections they have before the agency in order to preserve these issues for appeal. Issues not raised at the administrative level are deemed unpreserved for appellate review." Id. at 58. This court finds that New England is not applicable here. In New England, the plaintiffs

4

failed to raise their lack of due process claims until the matter came up for appeal, and the Law Court held that they were not excused from their "affirmative obligation to raise their due process arguments in the course of the proceedings before the Department." Id. at 60. Unlike the *ultra vires* claim in this case, however, due process claims do not go to the very essence of an agency, that is, the authority or jurisdiction granted to it by statute.

Indeed, an agency "cannot clothe itself with a jurisdiction it does not possess, nor can the parties confer upon it such jurisdiction either by waiver, consent or express stipulation." Girouard's Case, 145 Me. 62, 65, 71 A.2d 682, 683 (Me. 1950). See Waltz v. Boston & Rockland Transportation Co., 161 Me. 359, 368, 212 A.2d 431, 435 (Me. 1965) ("jurisdiction of [an agency] is always open for consideration of the Court"; "[t]hat the point was not raised before does not bar us from inquiry and decision"). See also Howell v. Indiana-American Water Co., Inc., 668 N.E.2d 1272, 1275-1276 (Ind. App. 1996), *transfer denied* 683 N.E.2d 582 (1997) (a party cannot confer jurisdiction upon an administrative agency by consent or agreement). "Jurisdiction may be conferred only by law, never by act or omission of the tribunal or, except over their persons, of the parties appearing before it." Girouard's Case, 145 Me. at 65. The plaintiffs have, therefore, properly raised this issue on appeal.

## B. Statutory Authority

Administrative agencies are creatures of statute, and can only have such powers as those expressly conferred upon them by the Legislature, or such as arise therefrom by necessary implication to allow carrying out the powers accorded to them. Hopkinson v. Town of China, 615 A.2d 1166, 1167 (Me. 1992); Valente v. Board of Environmental Protection, 461 A.2d 716, 718 (Me. 1983). In reviewing agency decisions, courts should hold agencies accountable to follow statutory requirements. Christian Fellowship and Renewal Center v. Town of Limington, 2001 ME 16, ¶ 18, 769 A.2d 834, 840.

The question here is whether the Department exceeded its statutory authority. In order to answer that question, the court must first determine what authority the enabling statute, specifically 7 M.R.S.A. §§ 1011-1028, grants the Department. In interpreting statutes, the main objective is to give effect to the Legislature's intent.

·Great Northern Paper, Inc. v. Penobscot Nation, 2001 ME 68, ¶ 15, 770 A.2d 574, 580, cert. Denied 122 S.Ct. 543 (2001). "To give effect to the Legislature's intent, [the court must] look first to the statute's plain meaning and, if there is any ambiguity, [the court must] look beyond that language to the legislative history to determine the intent of the Legislature." Id. In construing a particular section of a statute, the court must consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved. State v. White, 2001 ME 65, ¶ 4, 769 A.2d 827, 828-829.

The statutory scheme relied upon by Gagnon in issuing his decision, and argued by both parties, is Title 7, Subchapter X, Article 3 of the Maine Revised Statutes (7 M.R.S.A. §§ 1011-1028), pertaining to the licensing of dealers, processors, brokers, agents, and retailers of potatoes. The Legislature, in enacting the licensing statute, expressly stated its intent:

> [t]he Legislature finds that the potato industry has a substantial and unique effect on the economy of the entire State and Aroostook County in particular. Large numbers of the people in the State are directly or indirectly dependent on the industry. Over the years the industry has experienced wide fluctuations in prices and quality of product. Such fluctuations have caused commensurate instability in the economy of a large portion of the State. To a great extent the well-being of the industry is dependent upon those persons engaged in the marketing of the potatoes and rotation crops grown by others and the manner in which their services are performed. The entire manner of marketing potatoes and rotation crops is unique and requires special consideration.
>
> The Legislature intends through this legislation to exercise the police power of the State in order to protect and promote the general welfare of the potato industry and the people of the State and maintain and encourage fair and equitable practices in the handling, sale and storage of potatoes and rotation crops. Such stabilization of the potato industry will have the beneficial effect of improving the economy of the entire State.

7 M.R.S.A. § 1011 (2002).

Under Article 3, the Legislature specifically conferred upon the Department the power to license processors,[1] require licensed processors to file a bond in order to

---

1. "No person shall act as a . . . processor . . . unless duly licensed . . . ." 7 M.R.S.A. § 1014 (2002).

An applicant for a license "shall satisfy the commissioner of his character, financial responsibility and good faith in seeking to engage in the business." 7 M.R.S.A. § 1015 (2002). Likewise, "[t]he commissioner shall . . . issue a license to such applicant if he is satisfied as to the applicant's

insure the licensee's financial responsibility,[2] investigate verified complaints,[3] refuse to grant a license when a licensee has committed certain acts,[4] bring an action in the District or Superior Court to recover penalties imposed for violations of Article 3,[5] and bring an action on a defaulted bond.[6] The commissioner may not, without court

qualifications . . . ." Id.

2. "In order to insure the licensee's financial responsibility and to protect potato and rotation crop producers, the commissioner shall require the licensee to file a bond . . . payable to the commissioner in the commissioner's official capacity and conditioned on the full and prompt payment for all potatoes or rotation crops received or purchased from producers . . . during the effective period of the license." Id.

3. "The commissioner . . . shall have full authority to investigate upon the verified complaint of any interested person . . . the conduct and activities of any person applying for or holding a license as . . . processor . . . and for such purpose . . . may take testimony and affidavits thereon under oath." 7 M.R.S.A. § 1016 (2002).

4. The commissioner . . . may refuse to grant a license . . . upon finding that any of the following acts have existed within 2 years of the date of the filing of an application for license . . . ." 7 M.R.S.A. § 1017 (1) (2002).

5. "The commissioner may recover the penalties imposed for violations of this Article and any rules and regulations promulgated thereunder in a civil action brought in his own name . . . ." 7 M.R.S.A. § 1026 (2002).
"The District Court and the Superior Court shall have concurrent jurisdiction of actions brought for violation of this Article or the rules and regulations promulgated thereunder." 7 M.R.S.A. § 1027 (2002).
"Any person who shall violate any of the provisions of this Article, except section 1017 [(1)(B)], or shall neglect or refuse to comply with the provisions thereof or any rule or regulation promulgated hereunder shall be subject to the following civil penalties payable to the State to be recovered in a civil action . . . ." 7 M.R.S.A. § 1028 (2002).

6. "If any licensee shall fail to make such payment as provided in section 1017 [(1)(B)], such licensee . . . shall be in default . . . and the bond provided for shall be forfeited . . . and by nature of such default, the conditions of such bond shall be deemed to be broken, and any such producer or licensee may bring an action on the defaulted bond in the name of the commissioner for the benefit of said producer or licensee." 7 M.R.S.A. § 1025 (2002).

intervention, obtain satisfaction on a bond,[7] suspend or revoke a license,[8] or recover penalties.[9]

The plaintiffs argue that the Department acted outside its scope of authority. "If [an agency] exceeds its authority it acts without jurisdiction and its orders are of no effect and are subject to collateral attack." Stoddard v. Public Utilities Commission, 137 Me. 320, 323 (1941).

Article 3 allows Gagnon to conduct an investigation, but limits the reasons for which he can investigate and the "remedies" he can "award". Article 3 is a licensing statute. All violations of Article 3, except that violation articulated in section 1017 (4),[10] affect only whether the Department may retain or renew a license. Thus, any hearing conducted by the Department under this article must relate to a producer's license.

Nothing in the legislative history alters this court's opinion. It is apparent from the discussion in the legislative history that the Legislature intended this statute to contribute to the stabilization of the potato industry by requiring the "middle men" to identify themselves through a licensing process. The thrust of the statute is not directed at any effort to facilitate the resolution of disputes over potato transactions, but rather

---

7. See n.6 (7 M.R.S.A. § 1025).

8. "The commissioner . . . may refuse to grant a license . . . upon a finding that any of [certain enumerated] acts have existed within 2 years of the date of the filing of an application for license . . . ." 7 M.R.S.A. § 1017 (1).
   However, "[t]he District Court may . . . Suspend or revoke a license upon finding any of [certain] enumerated violations within 2 years of the date of the filing of a [verified] complaint." 7 M.R.S.A. § 1017 (1) (2002).
   Moreover, where the commissioner finds that a producer is in default of a payment schedule, "[t]he commissioner shall file a complaint with the District Court seeking to suspend the license of [the] licensee . . . ." 7 M.R.S.A. § 1017 (4)(A)(3) (2002).

9. See n. 5 (7 M.R.S.A. § 1026).

10. Under Section 1017 (4), if the commissioner finds that the processor has failed to make adequate payment for potatoes in violation of section 1017 (1)(B), he may require the processor to formulate a schedule of payments, but if the processor fails to follow the schedule, the Department must file a complaint with the District Court to suspend the license. In addition, if the licensee fails to make payment "as provided in section 1017 [(1)(B]", the licensee "shall be in default as to all producers or licensees whose accounts shall then remain unpaid, and the bond provided for shall be forfeited . . . ." 7 M.R.S.A. § 1025.

to identify and regulate the participants, *i.e.* producers, dealers, brokers, and processors, by licensing them. Absent from the deliberation was any comment indicating an intent to establish a "potato court" to achieve some kind of expedited resolution of disputes over potato contracts. This court does not see that the statute provides for the issuance of judgments or authorization of executions or other means of collection except by way of a court action against the bond, and, accordingly, finds that the Legislature did not contemplate that section 1025 was intended to become a plenary process to resolve potato contract disputes.

In this case, the verified complaints did not allege insufficient or nonpayment for potatoes sold to Northland. The verified complaints alleged that Northland "accepted 36% of the original contract" and "diverted the rest of the contract crop to Maine Packers," and "accepted 64% of the contract" and "[was] not willing to take anymore . . . ." The complaints make it fairly clear that Northland's actions did not fall under section 1017 (4), the only section which would provide any sort of "remedy" to the plaintiffs, *i.e.*, liquidation of the bond, because the complaints pertained to potatoes that had *not* been delivered.

This case is a contract dispute involving issues such as how to interpret the rejection clause, how often and when the plaintiffs and Northland expected deliveries to be made, and whether Northland's rejection was appropriate. Not only were the plaintiffs asking Gagnon to "render the damages," and "institute punitive damages," their opposition to Northland's Motion to Dismiss was based on the premise that their case was a contractual dispute.

Thus, although Gagnon did not have the power to hear contractual disputes nor grant either form of damages, he took the case and came to the legal conclusion that "Northland's refusal to accept delivery of potatoes from Soucy and Dubois was not a breach of contract." By denying Northland's motion to dismiss, and concluding that Northland's conduct did not constitute a breach of contract, Gagnon exceeded his authority to determine the "licensability" of potato processors. Gagnon's decision is, therefore, vacated.

9

THE DOCKET ENTRY IS:

The Department's decision is vacated.

The Clerk is ordered to incorporate this decision into the docket by reference.

_____
Justice, Superior Court

Dated: March 29, 2002